UNITED STATES, Appellee,

v.

John L. TYLER, Staff Sergeant, U.S. Air Force, Appellant.

No. 45,170.
ACMS 25618.

U.S. Court of Military Appeals.

April 9, 1984.

For Appellant: *Major Alexander S. Nicholas* (argued); *Colonel George R. Stevens* (on brief).

For Appellee: *Major Michael J. Hoover* (argued); *Colonel Kenneth R. Rengert* (on brief); *Lieutenant Colonel William H. Seckinger,* USAFR.

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to appellant's pleas, a special court-martial consisting of a military judge alone found him guilty of wrongfully possessing marihuana on or about February 1 and March 1, 1981, and of wrongfully possessing and selling cocaine on November 14, 1981, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The sentence included a bad-conduct discharge, confinement for 3 months, forfeiture of $250 pay per month for 3 months, and reduction to pay grade E–3. The convening and supervisory authorities approved the sentence; and in an unpublished per curiam opinion, the United States Air Force Court of Military Review affirmed the findings and sentence. Subsequently, we granted review of this single issue:

WHETHER THE IDENTITY OF A SUBSTANCE AS COCAINE CAN BE PROVED BEYOND A REASONABLE DOUBT BY THE OPINION OF A LAY WITNESS WHO USED THE SUBSTANCE IN CONJUNCTION WITH A LARGE QUANTITY OF ALCOHOL, WHERE THE WITNESS HAD USED COCAINE ON ONE PRIOR OCCASION.

I

Airman First Class Darrel Lenhart, the first government witness, testified that "[p]robably about November 10th to the 13th," he and appellant "were sitting in the chow hall and I said that I would sure like to get some cocaine." Thereupon Tyler responded, "I know where you can get some." According to Lenhart, "He said he could get me some and I asked him how much and he said $100" for a gram. Thereafter, appellant "just gave me his phone number and told me to call him the next . . . whenever I wanted it."

On November 14, 1981, Lenhart was at Airman Dale Kloefkorn's

house and I called . . . [Tyler] from Dale's house and told him to bring it over and he said it would be a while. I said okay, and then I called him again and he said he would be coming out.

Appellant told Lenhart "he would be getting . . . [cocaine] pretty soon"; and during this conversation—just as previously at the dining hall—the only kind of drug discussed was cocaine. Lenhart and Kloefkorn waited several hours for appellant's arrival; during this time Lenhart drank "[p]robably about two six packs" of beer.

Finally, Tyler arrived about 7 or 8 p.m. at Kloefkorn's house, whereupon Lenhart went outside to appellant's

car and we got in the car and he showed the piece of paper to me and I gave him $100 and he said it would be ten more dollars and I said okay and I gave him ten more dollars.

The paper Lenhart received "was like a magazine paper"; and "it was folded so nothing would spill out from what was inside of it." Lenhart placed the packet in his pocket and went back into Kloefkorn's house. During the purchase transaction—which lasted "[a]nywhere from three minutes to five minutes"—nothing had been mentioned about the contents of the packet. However, Lenhart testified that "I just knew it was coke and it was. I trusted Tyler." The purchase completed, Lenhart

[w]ent into the bathroom [at Kloefkorn's house] and made two lines. I took one and I left one there for Darrel [sic], and then I went and sat down and Darrel [sic]

went in there about ten minutes later and then he came back out and sat down. We did that back and forth for the rest of the night.

There was "[a]nywhere from a half a gram to a gram" of cocaine in the packet; and, according to Lenhart, he

used a hair pin or a hair clip or something like that to cut it up, and then I had a Bic pen and I snorted it through that. There was a little left on the cabinet so I rubbed that in my gums.

\* \* \* \* \* \*

[It] [n]umbed my face, made me feel kind of, you know, good like nothing was wrong. I was feeling great.

Lenhart returned to the bathroom three or four times that night; each time he "[s]norted the coke," and each time it "[m]ade me high .... I wouldn't get very much higher. I would just snort it and stay pretty much at the same high cause I was pretty drunk at the time. I was drinking at the same time I was snorting."

The cocaine which Lenhart bought that night from Sergeant Tyler "was white and it had little chunks like little rocks of white in it," and it was "a powdery like substance." Lenhart had used cocaine once before—about three months before he entered the Air Force, and the cocaine he purchased from appellant on November 14 looked the same as that which he had used on the prior occasion. Lenhart also testified that, when he had used cocaine before, it made him feel "[e]uphoric. It made me feel good" and it was "[n]umbing." On that earlier occasion, the cocaine was packaged the same way as on November 14— namely, "[w]rapped in a [folded] newspaper," which Lenhart "just opened up."

When he was asked by trial counsel, "What formal training, if any, have you had with the identification of cocaine?", Lenhart responded—"Well, you took me down to the OSI twice, one yesterday and one today, and I picked out the cocaine out of two substances yesterday and out of four substances today." Defense counsel objected, whereupon trial counsel stated that "the government would be more than happy to call Special Agent Blommaert who conducted the test" and requested the judge "to perhaps withhold ruling on that particular objection until you've heard his testimony." The judge agreed to defer his ruling.

Subsequently, at the end of the direct examination, Airman Lenhart testified, without defense objection, that "based on ... [his] experience and the events of 14 November 1981," his "opinion" was that "[i]t was cocaine" which he had "ingested that night."

During cross-examination, Lenhart conceded that he probably had drunk 18 beers that night and that he had "lied twice to [Special] Agent Gregg" of the Office of Special Investigations (OSI) before telling her the version of the facts to which he was testifying at the trial. He also admitted that he had used marihuana "[q]uite often"; but, on cross-examination, Lenhart reiterated that only once before had he used cocaine.

Airman Kloefkorn then testified for the Government that about November 14, 1981, Lenhart had come to his house and they had begun drinking beer at the rate of "[a]bout two an hour." When appellant drove up to the house, Kloefkorn and "Lenhart went outside to his car ... Lenhart got in the car and I stood outside the car. Lenhart gave him the money and he gave ... Sergeant Tyler gave him a piece of paper that was folded up." He and Lenhart went back inside the house "after the exchange of money and the paper," and Lenhart

went into the bathroom and I don't know what he did in there. He came back out and he said there was a line on the shelf in there for me to snort.

‘ \* \* \* \* \* \*

Then I went into the bathroom and snorted it....

I used U.S. currency....

My face became numb and I felt like I needed to do something all the time, you know, it was like adrenalin flowing or something like that.

The numbness was "[u]nder the eyes and in the nose." The substance "was a white powder," which "kind of looked like powder sugar." Kloefkorn testified that he had "[a] little bit of knowledge" about the effects of cocaine—knowledge which he had acquired from hearing a policeman when he was a junior-high-school student and from watching "a couple of TV shows about it." Although he had never used cocaine before, it was Kloefkorn's "understanding . . . [t]hat it gave a numbing sensation through the body; that it made you feel kind of on top of the world, I guess." According to Kloefkorn, he had "felt pretty good"; and, without defense objection, he testified that "based upon . . . [his] knowledge and experience," he believed it was "cocaine" which he "snorted that night."

Special Agent Dane L. Blommaert of the OSI testified that he knew Lenhart and Kloefkorn and that, on both February 16 and 17, 1982, he had "set up a display of several different compounds to see if they could identify cocaine from those." The first time

> we set up three different substances, sugar, cocaine and coffee creamer, laid out on three separate black pieces of paper. Had Airman Lenhart try and identify the cocaine which he was able to pick out the cocaine. Then had Airman Kloefkorn try to identify the cocaine from those three which he correctly picked the cocaine.

On February 17—the very day the trial began—

> we set up another display, added a fourth drug—some granules from an ephedrine capsule, crushed up granules from an ephedrine capsule. Again, Airman Lenhart correctly picked out the cocaine from the four substances on that date.

> \* \* \* \* \* \*

> Airman Kloefkorn had a hard time discerning between the coffee creamer and the cocaine.

At the end of the direct examination, defense counsel objected that Blommaert's line of testimony was irrelevant to Len-

hart's identification of the substance in November. Finally, after further questioning of the witness had been completed, the judge overruled the defense objections to testimony about Lenhart's identification of the cocaine on February 16 and 17.

Airman First Class John Bates testified about the use and possession of marihuana with which appellant was also charged.[1] Then the Government rested, whereupon the defense offered two witnesses to testify about prior inconsistent statements made by Lenhart. However, appellant did not take the stand himself. After argument, the judge announced his findings.

## II

### A.  *Admissibility*

■ Appellant now claims on appeal that Lenhart and Kloefkorn should not have been allowed to express their opinions that the substance they "snorted" on November 14, 1981, was cocaine. However, even if they were only "lay witnesses," their "opinions and inferences" were "(a) rationally based on" their perceptions, "and (b) helpful to" the factfinder in "the determination of a fact in issue." Mil.R.Evid. 701. Just as a lay witness may testify as to "whether or not a person was drunk" *see* Drafters' Analysis to Mil.R.Evid. 701, Appendix 18, Manual for Courts-Martial, United States, 1969 (Revised edition), we believe that he may be allowed to identify a substance as marihuana, cocaine, or one of the other more common prohibited drugs if his opinion is supported by facts he has observed.

Thus, as the Court noted three decades ago: "It has been well established that a user of a habit-forming drug may express an opinion on its identity." *United States v. Smith*, 3 U.S.C.M.A. 803, 805, 14 C.M.R. 221, 223 (1954). Moreover, habitual use is not required. In *Smith*, the testimony of a government witness that he and the accused had received shots of morphine was held to be admissible even though he only testified about "two previous occasions

---

1.  He was convicted of possession but acquitted of use.

when he had received an injection of morphine." The Court stated:

> [O]n one of the two identified occasions the drug was obtained from an Army dispensary, the container was labeled, and the dosage was given by Army medical personnel. From this injection he received the same physical reaction as he did from the solution administered to him on the occasion now in question. *That evidence alone is sufficient to permit him to express an opinion to the fact finders.* While his experience might be limited, a satisfactory base is established to admit the testimony. The extent of his other prior use of the drug might affect the weight to be given to his testimony but not its competency.

*Id.* at 805, 14 C.M.R. at 223 (emphasis supplied).

In *United States v. Jackson*, 49 C.M.R. 881 (A.F.C.M.R.), *pet. denied*, 23 U.S.C.M.A. 648, 50 C.M.R. 904 (1975), a lay witness had been allowed to testify that the accused had transferred and used hashish. The witness was himself "a nonuser," but on several occasions an OSI agent had burned hashish in his presence to make him familiar with its smell. In upholding the admissibility of this testimony, Judge Early explained:

> The concept of qualifying a layman to identify drugs on the basis of his prior drug use has been judicially recognized. In United States v. Quindana, 12 CMR 790 (AFBR 1953), two prisoners were permitted to testify that the substance sold to them by the accused was heroin. Both prisoners were drug addicts who had past experience and were acquainted with the effects of heroin on the mind and body. The Board of Review found that "[t]hey were in a sense, and certainly in comparison with court members, 'experts' in the field." 12 CMR at 794. The Board went on to state that
>
> "... the only true criterion is: 'On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to

that subject, and is not fixed or limited to any class of persons acting professionally.'" 12 CMR at 794, citing 7 Wigmore, Evidence, sec. 1923.

> Opinion testimony of nonexperts has also been held admissible for the purpose of identifying marihuana where the witness demonstrated his familiarity with the drug's various forms, its distinctive odor when smoked and with the symptoms displayed by those under its influence. ...

> The teaching of these cases is that a witness need not be a chemist, nor be possessed of training that would qualify him to identify the substance in question by chemical analysis, in order to give his opinion as to the identity of a particular drug. Rather they recognize that laymen may, with proper qualifications, testify with specificity as to the nature of a drug by having observed its physical appearance and odor and its physiological effect on others.

49 C.M.R. at 883.

■ Although Lenhart could hardly be termed an "expert" on drugs—even though he had used cocaine once before and marihuana "quite often"—he certainly had a "specialized knowledge" of drug effects which presumably was unavailable to the court members. Moreover, that knowledge would "assist the trier of fact to understand the evidence" and "to determine a fact in issue." Mil.R.Evid. 702. Thus, clearly his testimony was admissible within the policy of the Military Rules of Evidence. *See* Mil.R.Evid. 701 and 702.

■ Both Lenhart and Kloefkorn had been drinking extensively before appellant arrived with the drugs. While the ingestion of alcohol might affect the reliability of their opinions, it did not destroy their admissibility.

■ In any event, the two witnesses expressed their opinions without defense objection at trial; so appellant waived his right to complain later about their admissibility. Mil.R.Evid. 103(a)(1). While the waiver does not preclude this Court from

"taking notice of plain errors that materially prejudice substantial rights," Mil.R.Evid. 103(d), the reception of this opinion evidence—if error at all—does not rise to that level.

■■■ Appellant did object at trial to admission of evidence about the results of the tests to which the OSI special agent had subjected Lenhart and Kloefkorn on February 16 and 17. Subsequently, the Court of Military Review concluded that

[t]he [military] judge erroneously admitted testimony of a government agent, concerning tests he had administered to the two key government witnesses on the day before, and the day of trial. The results of these tests, which involved each witness' selection of a sample of cocaine from samples including sugar and coffee creamer, obviously were irrelevant to either witness' ability to visually identify cocaine three and one-half months earlier, at the time of the offense.

Unpublished opinion at 2. This conclusion seems questionable. Under Mil.R.Evid. 321(a)(1), "[t]estimony concerning a relevant out of court identification by any person is admissible, subject to an appropriate objection under this rule, if such testimony is otherwise admissible under these rules." While a "lineup" may be the most familiar type of "identification process," the principles applicable to identification of persons would also seem to apply to the identification of substances and objects. We perceive nothing "unlawful" about the tests administered to Lenhart and Kloefkorn by the OSI, since those tests do not appear to have been "unnecessarily suggestive or otherwise in violation of . . . due process." Mil.R.Evid. 321(b)(1). Because this was not a "lineup," the presence of appellant's counsel was not required for the tests, even though charges had been preferred and trial was imminent. *Cf.* Mil.R.Evid. 321(b)(2)(A); *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

■■■ The Court of Military Review took the view that the ability of Lenhart and Kloefkorn to identify cocaine in February 1982 was "irrelevant" to their ability to identify this drug in November 1981. In the absence of some indication that during the three-and-a-half-month interval the witnesses—by experience, training, or otherwise—had enhanced their skill in recognizing drugs, it would seem reasonable to assume that this skill was the same at both times. On that premise, the evidence about the tests administered to Lenhart and Kloefkorn could be considered "relevant," *see* Mil.R.Evid. 401—although a military judge would have the discretion to exclude it under Mil.R.Evid. 403.

## B. *Sufficiency*

■■■ Appellate defense counsel also contend that, even if all the government evidence were admissible, it still does not suffice to establish beyond a reasonable doubt that Tyler sold *cocaine* to Lenhart. In considering this contention, we are hindered by the language of the assigned issue on which we granted review, for it implies that the Government's case rested solely on Lenhart's opinion that the substance ingested was cocaine.

In fact, a great deal of other evidence also supported the judge's finding. Perhaps most important, the actions and statements of appellant constituted a representation on his part that the substance he sold to Lenhart on November 14 was cocaine. To use the terminology of commercial law, Tyler gave an implied warranty—and perhaps an express warranty as well—that cocaine was contained in the folded paper. Thus, in one sense appellant himself was a witness to the nature of his merchandise. Moreover, because appellant purported to be a drug dealer, he can hardly complain if the factfinder gave considerable weight to his warranty that the packet delivered to Lenhart contained cocaine.

Extensive circumstantial evidence also sustains the findings of guilty: (a) the sale was made in a clandestine manner in the dark; (b) the substance sold was a white powder, wrapped in the same manner as the cocaine Lenhart had purchased once before; (c) the price was $110 for a gram; (d) the drug was "snorted" with a pen or a rolled

up bill; and (e) the effects of the drug included euphoria and numbness under the eyes and in the nose.[2]

Although chemical analysis of a drug may facilitate proof of the Government's case, it

> is not essential to a valid conviction for a narcotic offense. Neither is it necessary that direct evidence be presented to prove the nature of the substance. [Citations omitted.]
>
> > "Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics."

*United States v. Jessen*, 12 M.J. 122, 126 (C.M.A. 1981), quoting from *United States v. Clark*, 613 F.2d 391, 405–06 (2d Cir. 1979). In the case at bar, the unrebutted evidence furnished ample ground for the military judge as factfinder to infer that the material sold by appellant on November 14 was cocaine. *Cf. United States v. Smith, supra.*

### C. *Prejudice*

■ The Court of Military Review held that the trial judge should have excluded the evidence about the testing of Lenhart and Kloefkorn, but that the error had not prejudiced appellant. Although we have already questioned the premise that this evidence was inadmissible, we fully agree that its reception did not affect the outcome of the trial. Indeed, we are sure that the judge would have entered the same findings of guilty on the basis of the "ample evidence, independent of these tests." Unpublished opinion at 2.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

**2.** Of course, it would have been desirable if medical testimony had been offered about the physiological effects of cocaine.