UNITED STATES, Appellee,

v.

Laverne S. CAMERON, Staff Sergeant,
U.S. Army, Appellant.

No. 48,866.

CM 441691.

U.S. Court of Military Appeals.

Nov. 18, 1985.

For Appellant: *Captain Peter D. P. Vint* (argued); *Colonel William G. Eck-*hardt, *Lieutenant Colonel Arthur L. Hunt, Captain Thomas J. Feeney* (on brief); *Colonel Brooks B. LaGrua, Major Marion E. Winter, Captain Barbara M. Lederer, Captain Carolyn F. Washington.*

For Appellee: *Captain Erik M. Stumpfel* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Captain Garreth E. Shaw, Captain Thomas J. Benjamin* (on brief); *Lieutenant Colonel Thomas M. Curtis.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial sitting at Bremerhaven, Federal Republic of Germany, and consisting of a military judge alone tried appellant on charges that on March 29, 1981, he had carnally known his adopted daughter, Melissa, and had attempted to commit sodomy with her, in violation of Articles 120 and 80, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 880, respectively. Contrary to his pleas, he was convicted of carnal knowledge and sentenced to a bad-conduct discharge and reduction to the grade of E–1. The convening authority approved the findings and sentence; and the Court of Military Review affirmed in a short-form opinion. We granted review on this issue:

> WHETHER THE ADMISSION OF PORTIONS OF MRS. MARCHELOS' TESTIMONY CONSTITUTED PREJUDICAL ERROR.

I

The Government's sole witness in its case-in-chief (Melissa) testified that she had been awakened by appellant around 6:00 or 6:30 a.m. on March 29, 1981. Dressed in a nightgown and robe, she went downstairs and made some coffee, while her foster mother and brother continued to sleep upstairs. Appellant, who was wearing a housecoat, was on the couch; and he called her to "come here." At first she "did not

go"; but after he said this a second time, she went over to him. He took off her clothes and "forced" her to lie down on the couch, after which sexual intercourse occurred. Subsequently, she went back to bed and did not get up until afternoon. She did not tell her mother or brother what had happened; but that evening she "ran away ... [b]ecause" she "was hurt and ... couldn't take it any more and ... wanted to leave." For a short time she was at a friend's home and then spent the night elsewhere. The next day she told someone what had occurred.

On cross-examination, Melissa, who was twelve-years old at the time of the alleged offense, conceded that she did not always tell the truth. She had lied for herself and others; and she had lied about herself and others. When she lied, she "was trying to cover myself and help the other people out." According to her, she had no idea why appellant had taken off her clothes that morning. However, she testified that sexual intercourse with appellant had been occurring frequently during the two years that she had been living with the Camerons after her adoption. However, even though "[t]his had been happening about every other day for two years," she had never told anybody about it because her mother or father would have killed her. On March 29, Mrs. Cameron had made her run up and down stairs 50 times for some reason that Melissa did not remember. When she ran away, she "didn't want to go back to the house"; but the incident with her father that morning "was not the biggest reason ... [she] didn't want to go back." Melissa admitted that she had "lied to try and hurt somebody" and that once she had lied to get a teacher in trouble. Also she had lied "a lot of times to get her [mother] in trouble." She knew that, if appellant were sent to jail, this would "hurt" Mrs. Cameron. After this incident, she had been in a foster home in Bremerhaven; and twice she had run away from there. On a prior occasion she had claimed that a "guy that was babysitting for ... [a] friend of her mother" had made sexual advances.

Melissa had learned about sex from some earlier foster parents, who had adopted her before the Camerons did so. She felt that Mrs. Cameron treated her brother better than she was treated; and because of this she hated her foster mother "[v]ery much." However, she denied that she had "made up this story about" her father in order to "hurt the family"; and she explained that "[i]f I really wanted to hurt him and I really wanted to hurt her, it could be that I could break up their relationship with each other ... [b]y telling lies and things." Melissa never wanted to see her foster parents again, "because I will be angry at them for the rest of my life." Some of the boys at school had "complained" about her; and some of these complaints "had to do with sex."

The first defense witness, Mrs. Joanne Levan, had at one time been a babysitter for the Camerons and in that capacity had come to know Melissa "[v]ery well," She did not consider Melissa to be "a very truthful person." On one occasion Melissa had accused a nineteen-year old boy "of trying to get her to do things she didn't want to do." Her reputation in the neighborhood "was one of an untruthful child," and she was "manipulative of adults in general."

Mrs. Catherine Perolman, a school teacher, had taught Melissa for two years and had frequent contact with her. "Melissa's credibility" was "poor"; and this witness "found it necessary all the time to check up on stories she told me." Around the school, Melissa had the reputation with students and teachers of being "an untruthful person." She was manipulative and wanted "people to be aware of her." "At times" she "was a malicious child"; and she was aggressive.

Lieutenant Colonel Nicholas Morelli had been a clinical social worker for most of his seventeen years in the Army Medical Service Corps; and he held master's degrees in clinical social work and in psychology. He also had undergone a two-year clinical internship in child guidance at Walter Reed Hospital. From July 1980, he had clinical

contact with Melissa and her family; and he had regular sessions with her. She lied; and in his opinion she had "problems recognizing that she's lying." She was "a manipulative person"; and "she has a very busy fantasy life, very active." Morelli had extensive experience with children who were the victims of sexual abuse; and in his opinion, Melissa did not "fit ... the general pattern of a child sexually abused." According to him,

I, personally, have a doubt about anything that Melissa says and I've mentioned it to her but I have no way of determining whether, at any time, she's telling the truth or not.

First Lieutenant Candace Tormey testified that for about six weeks after the alleged incident with appellant, Melissa lived in her home. According to this witness, "I would say that nine times out of ten I could find that I did not feel that she was being truthful."

Roy G. Wendt, an elementary school counselor, had seen Melissa on numerous occasions over a two-year period. In his opinion "she would not hesitate to tell a lie to protect herself or to cover up something that had happened."

Special Agent Denise Scarboro had talked with Melissa on March 30 about her allegations against appellant. Between the first interview and a second interview about three hours later, the statements by Melissa had changed materially.

The defense then offered stipulated evidence that at the time of the alleged offense, Melissa had a vaginal infection of trichomonas and that, "[i]f a male ha[d] sexual intercourse with a female" suffering from this infection, "a twenty per cent (20%) probability" exists "that the male would contract *Trichomonas* from a single exposure." Moreover, "[t]his probability approximately doubles with each subsequent exposure of the male to the infected female." On March 31, 1981, an examination of appellant revealed no evidence of trichomonas.

In rebuttal, the prosecution called only one witness, Mrs. Beverly Marchelos, who was a social worker for Army Community Services. She had received a master's degree and had worked in a number of psychiatric situations. On March 30, a chaplain had brought Melissa to her office, where she stayed for more than seven hours. "She told me that she had been involved in sexual activity with her father, that she had run away because of it, because she couldn't stand it any more." Mrs. Marchelos had counseled sexually-abused children about a dozen times in the preceding three years; "this is the only time in the last year and the others would have been the two years before while at Fort Bliss."

At this point in the direct examination the following colloquy occurred:

Q. Now, you say that you spent a number of hours with Melissa and she had told you—she had alleged something to you about what had happened. Do you feel that you were able to reach an opinion, basically, we just need to know at this point if you were able to reach an opinion, as to her credibility, her truthfulness in what she was saying?

A. Yes, I feel that Melissa was truthful.

DC: Your Honor, could you—we would object to the witness expressing an opinion on that point. We don't feel she has been qualified as an expert to express an opinion as to Melissa's credibility.

MJ: Well, I think anyone can express an opinion as to credibility if they knew the person for any length of time. I think [what] we should limit it to is credibility in general——

DC: Yes, sir.

MJ: And not as to any particular point.

TC: The next question was simply going to be what her opinion was and of course, any weight that might be attached to this testimony as regarding any other testimony, of course, would be a matter for the court, Your Honor.

MJ: Now, all I want to hear is her opinion as to credibility in general not as to any particular point.

TC: Very well, sir.

WIT: I believed what Melissa told me.

TC: You did believe that she was credible?

WIT: Yes.

## II

### A

Mil.R.Evid. 608(a) provides:

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Obviously, Melissa's character for truthfulness had been vigorously attacked by the defense; and so the prosecution could properly attempt to rehabilitate her by offering evidence that referred to her "character for truthfulness or untruthfulness." However, trial counsel did not ask Mrs. Marchelos about her opinion as to Melissa's character or reputation for truthfulness.[1] Instead, trial counsel asked about *"her truthfulness in what she was saying,"* (emphasis added), and over defense objection obtained the answer "that Melissa was truthful." Subsequently, Mrs. Marchelos added, "I believed what Melissa told me."

This testimony goes beyond the area of inquiry permitted by Mil.R.Evid. 608(a) and presents the dangers discussed in two recent opinions of the Courts of Military Review. In *United States v. Wagner*, 20 M.J. 758 (A.F.C.M.R. 1985), a security police investigator had been allowed to testify as an expert on untruthfulness. As a basis for this evidence, trial counsel had elicited that the witness had been trained as an investigator and that the the training specifically included a course on "distinguishing truthful statements from untruthful statements." *Id.* at 760. Moreover, the investigator had conducted over 2,000 interviews during a five-year period. The witness was allowed to express his "impressions" that the accused had been telling the truth when he confessed during an interrogation—although subsequently he had recanted the confession. In holding that the trial judge erred, Judge Snyder explained:

Mil.R.Evid. 702 and 704 govern the areas of opinion testimony which are germane to the instant case. Rule 702 reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This area of the Military Rules of Evidence was intended to broaden the parameters of admissible opinion testimony. *United States v. Snipes, supra* [18 M.J. 172 (C.M.A.1984)]. But it is not without limitation.

Sgt Coleman's training and extensive experience clearly rendered him more qualified than the average person in the area of criminal investigation and interrogation. However, to be admissible, expert opinion testimony must be helpful to the factfinder in resolving a matter in issue, regardless of the expert's qualifications. Mil.R.Evid. 702; *United States v. Snipes, supra* ; *United States v. Ellsworth*, 738 F.2d 333 (8th Cir.1984); *see United States v. Tyler*, 17 M.J. 381 (C.M. A.1984). The problem with Sgt Coleman's opinion testimony is that it was not admitted to assist the members in the area of criminal investigations, *i.e.*, the

---

**1.** Mrs. Marchelos met Melissa for the first time on March 30, although she saw her on several occasions thereafter. In view of this rather limited contact with Melissa, there might be some question as to whether she had an adequate opportunity to form an opinion as to her character or reputation for truthfulness.

circumstances surrounding appellant's interrogation, including his demeanor, but was offered, and admitted, to "assist" the members in making their determination on appellant's credibility, which was one of the ultimate issues of the instant case. This is where the trial judge erred, Rule 704 notwithstanding.[4]

Rule 704 of the Military Rules of Evidence deleted the prior restriction against admitting opinion testimony on the ultimate issue of a case. Consequently, an opinion is no longer objectionable merely because it embraces an ultimate issue of the case. *See United States v. Tyler, supra* ; *United States v. McCoy*, 539 F.2d 1050 (5th Cir.1976). Admissibility will depend on the nature of the issue, the circumstances of the case, and judicial discretion. *United States v. McCoy, supra*, 1063. This relaxation, however, does not apply to opinion testimony on the guilt or innocence of the accused, for such opinions are viewed as unhelpful. Drafters' Analysis, Military Rules of Evidence, Rule 704. Additionally, allowing Sgt Coleman's opinion violated the concept that opinion evidence on the truthfulness of a particular witness is inadmissible.

Prior to the Federal and Military Rules of Evidence, the prevailing rule was that the factfinder needed no expert assistance in deciding whether a particular witness was to be believed. *United States v. Parks*, 17 U.S.C.M.A. 87, 37 C.M.R. 351 (1967); *United States v. Jefferies*, 12 U.S.C.M.A. 259, 30 C.M.R. 259 (1961); *United States v. Adkins*, 5 U.S.C.M.A. 492, 18 C.M.R. 116 (1955). Indeed, it was often stated that, "the jury is the lie detector." *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir.1973). This restriction was not relaxed by either the Federal or Military Rules of Evidence. The rule remains that, absent unusual circumstances, opinion testimony on whether or not to believe a particular witness' testimony simply is not deemed helpful to the factfinder, for the factfinders are perfectly capable of observing and assessing a witness' credibility.[5]

*United States v. Ellsworth, supra* ; *United States v. West*, 670 F.2d 675 (7th Cir.1982); *United States v. Provenzano*, 688 F.2d 194, 203–204 (3d Cir.), *cert. denied*, 459 U.S. 1071 [103 S.Ct. 492, 74 L.Ed.2d 634] (1982); *United States v. Pacelli*, 521 F.2d 135, 140 (2d Cir.1975); *see United States v. Snipes, supra* (Everett, C.J., concurring). This is especially so where testimony of the accused is involved.

Consequently, Sgt Coleman should not have been referred to as an expert on "truthtelling in confessions," and his opinion on whether appellant was truthful when he confessed should not have been allowed. *See United States v. Clark*, 12 M.J. 978 (A.F.C.M.R.1982).

---

[4] Rule 704 reads as follows:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

[5] This concept is not to be confused with opinion testimony on character, which is allowable under Mil.R.Evid. 608(a) for impeachment purposes. *See United States v. Awkard*, 597 F.2d 667 (9th Cir.1979).

20 M.J. at 760–62 (footnote omitted).

In *United States v. Tomlinson*, 20 M.J. 897 (A.C.M.R.1985), a conviction of rape was set aside because the military judge had admitted, over defense objection, expert testimony that the victim was suffering from a post-traumatic stress disorder consistent with "rape trauma syndrome." Senior Judge Yawn explained:

Captain Butler's testimony was introduced simply to bolster SSG H's credibility and reinforce her testimony concerning the events at issue. Captain Butler's consistent reiteration that SSG H's symptoms were consistent with rape trauma syndrome and his assertions that SSG H came to him following a sexual assault, that she exhibited anger at the rapist, and that it was unlikely SSG H faked the symptoms of rape trauma, constituted an implied opinion that SSG H had spoken the truth when she testified that appellant had raped her. In addition, CPT Butler's assertions that SSG H came to

him "following a sexual assault" and that she exhibited anger at the "rapist" provided explicit support for SSG H's credibility. Since the record does not indicate that CPT Butler had any personal knowledge concerning the alleged rape or that he attempted to acquire such knowledge, these assertions were necessarily based on recitations SSG H made to CPT Butler and were no more than affirmations by CPT Butler that he believed the accuracy of SSG H's representations. Even CPT Butler's consistent use of and emphasis on the phrase "rape trauma syndrome" suggested that the syndrome could only have been caused by rape. *See State v. Taylor*, 663 S.W.2d [235] at 240 [(Mo.1984) (en banc)].

The court members in this case were fully competent to determine whether SSG H was credible; consequently, the probative value of CPT Butler's testimony was not great. The danger of unfair prejudice created by such testimony is obvious since the admission of CPT Butler's testimony gave "a stamp of scientific legitimacy" to the truth of SSG H's factual testimony. *State v. Saldana*, 324 N.W.2d 227, 231 (Minn.1982) (citation omitted). *Cf. United States v. Moore*, 15 M.J. 354, 375 (CMA 1983) (Everett, C.J., dissenting) (special reliability of expert's testimony may create substantial danger of undue prejudice); *People v. Bledsoe*, [36 Cal.3d 236, 203 Cal.Rptr. 450, 460] 681 P.2d [291] at 301 [(Cal.1984)] (testimony of expert that victim exhibited symptoms of rape trauma syndrome unfairly prejudices an appellant by creating aura of special reliability and trustworthiness). Moreover, CPT Butler's testimony gave rise to a clear danger that the court members would consider his testimony dispositive on the issue of consent. *See State v. Taylor*, 663 S.W.2d at 241 (expert opinion that victim suffers from rape trauma syndrome creates risk that jury will consider opinion, with its misleading aura of certainty, dispositive on issue of consent). Captain Butler's assumption that SSG H's complaints arose

from a sexual assault and the designation of SSG H's symptoms as rape trauma syndrome necessarily imply the legal conclusion that SSG H was the victim of a rape. While we believe CPT Butler could have properly testified that SSG H's symptoms were consistent with a traumatic experience or even a stressful sexual experience, his testimony was not so limited. Indeed, construed in its entirety, CPT Butler's testimony appeared to be an opinion that a rape, in the legal sense, had in fact occurred. Such testimony goes too far and unfairly prejudiced the appellant.

By saying that CPT Butler's testimony unfairly prejudiced the appellant, we do not just mean that the testimony was highly damaging. "[E]vidence is 'unfairly prejudicial' when it is apt to be used for something other than its logical, probative force, e.g., when court members might dramatically overestimate its value, be confused as to its meaning, or emotionally react to it." *United States v. Williams*, 17 M.J. [548] at 550, [(ACMR 1983), *pet. denied*, 18 M.J. 432 (1984)] (citations omitted). In this case, CPT Butler's testimony that SSG H suffered from rape trauma syndrome created a substantial risk that the court members would be overawed by CPT Butler's testimony and abdicate their responsibility for determining the credibility of SSG H's testimony. *Cf. United States v. Snipes*, 18 M.J. [172] at 180 [(C.M.A.1984)] (Everett, C.J., concurring in the result) ("[H]earing a purported expert give his opinion about the credibility of a witness may hinder the factfinder by distracting him from using his own experience and common sense...."). Both the government and the accused are entitled to have issues of fact and credibility decided by court members. To allow an "expert" to offer his opinion on the resolution of a credibility dispute goes too far, and it makes no difference whether the opinion is express or follows inferentially from the expert's diagnosis of a psychological condition suffered by the

witness whose credibility is at issue. The court members must decide whether a witness is telling the truth. Expert insights into human nature are permissible, but lie detector evidence—whether human or mechanical—is not. Otherwise, trials could degenerate into a battle of experts expressing opinions on the veracity of various witnesses. *See State v. Taylor*, 663 S.W.2d at 241.

We do not suggest that all testimony concerning the effects of emotional trauma are inadmissible. For example, testimony that emotional trauma may cause lapses or inconsistencies in recollection would have been proper rebuttal evidence to show that the inconsistencies in SSG H's statements to the investigators could have been caused by the trauma rather than untruthfulness. As the Supreme Court of California has recognized, such testimony "may play a ... useful role by disabusing the [court] of some widely held misconceptions about ... victims, so that it may evaluate the evidence free of the constraints of popular myths." *People v. Bledsoe*, [203 Cal. Rptr. at 457] 681 P.2d at 298 (citations omitted). Testimony of this type is relevant and may not be unduly prejudicial provided the testimony is couched in general terms and is not offered as a professional evaluation of the truthfulness of a witness. *Cf. People v. Roscoe*, [168 Cal. App.3d 1093, 215 Cal.Rptr. 45] 37 Crim.L. Rep. (BNA) 2259 (Cal.Ct.App., 5th Dist., June 4, 1985) (introduction of expert testimony for purposes of rehabilitating witness's credibility should be limited to a discussion of victims as a class and should not extend to a discussion and diagnosis of particular witnesses).

Caution is required, however, whenever the expert's testimony approaches an opinion that in a given case a rape has in fact occurred. An expert's qualification to suggest a witness was raped because she suffers from rape trauma syndrome is at best questionable. *See State v.*

*Taylor*, 663 S.W.2d at 240. As several state courts have noted, the concept of rape trauma syndrome was "not devised to determine the 'truth' or 'accuracy' of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients." *People v. Bledsoe*, [36 Cal.3d 236, 203 Cal.Rptr. 450, 459] 681 P.2d 291, 300 (Cal.1984); *see State v. Saldana*, 324 N.W.2d 227, 230 (Minn.1982); *see also State v. Taylor*, 663 S.W.2d 235 (Mo. 1984) (en banc) (fact that victim exhibited symptoms of rape trauma syndrome does not qualify expert to designate experience that gave rise to trauma). Additionally, while certain symptoms have been identified as indicative of rape trauma syndrome, *see e.g.*, Burgess & Holmstrom, *Rape Trauma Syndrome*, 131 Am.J.Psychia. 981 (1974), the same symptoms could result from other stressful situations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 236–38 (3d ed. 1980).

20 M.J. at 901–02.

We have quoted at length from those two opinions because they reflect a keen awareness of the danger that purported experts may be allowed to testify on a subject as to which their opinion has meager scientific basis and minimal value but has substantial potential for misleading the factfinder. The reception of Mrs. Marchelos' testimony that she believed Melissa is subject to this condemnation. In this instance, the witness was saying more than that in her opinion the witness was a person of truthful character. Instead, taken in context, her testimony constituted an assertion that this expert believed that Melissa had told the truth about the incident with appellant.[2]

---

2. We note also that in describing her counselling experiences with sexually abused children, Mrs. Marchelos stated that "this is the only time

in the last year"—clearly an affirmation that Melissa was abused. *Cf. United States v. Tomlinson*, 20 M.J. 897 (A.C.M.R.1985).

Thus, Mrs. Marchelos gave the alleged victim's version a purported scientific support that otherwise would have been lacking. However, despite her training this witness really had no better basis than the factfinder for knowing whether Melissa's recital of events was truthful.

### B

When, as here, trial is before a military judge alone, we are reluctant to reverse for error in evidentiary rulings. However, we do not always assume that such errors are nonprejudicial because the factfinder is legally trained. *See United States v. Kahakauwila*, 19 M.J. 60, 61 (C.M.A.1984); *United States v. Bruce*, 14 M.J. 254 (C.M.A.1982); *United States v. Roa*, 12 M.J. 210, 211 (C.M.A.1982). Clearly, the Government's case against appellant was weak; it lacked any supporting medical evidence, and the alleged victim's account had been impugned in several ways. Indeed, the weakness of the case had led the Article 32, UCMJ, 10 U.S.C. § 832, investigating officer to recommend against trial. The type of offense involved is one for which formerly there existed special requirements of corroboration because of the danger of false accusations. *Cf.* para. 153a, Manual for Courts-Martial, United States, 1951 and 1969 (Revised edition);

*United States v. Sandoval*, 18 M.J. 55 (C.M.A.1984).

Under these circumstances we cannot ignore the possibility that the military judge may have been unduly influenced by the testimony of Mrs. Marchelos that she believed Melissa's account. Accordingly, we conclude that in this case the findings of guilty cannot stand.

### III

The decision of the United States Army Court of Military Review is reversed and the findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

COX, Judge (concurring with reservations):

I concur with Chief Judge EVERETT that the military judge erred by permitting Mrs. Marchelos' testimony over defense objection. I also agree that the error was serious enough to warrant reversal, since the credibility of the victim was so crucial.

I write only to make it clear that my concurrence is limited to the facts of this case. I do not deem it necessary at this time to decide whether *United States v. Wagner*, 20 M.J. 758 (A.F.C.M.R.1985), and *United States v. Tomlinson*, 20 M.J. 897 (A.C.M.R.1985) are correct.