UNITED STATES, Appellee,

v.

Specialist John L. BOSTICK, 131–58–4916, United States Army, Appellant.

ACMR 9001520.

U.S. Army Court of Military Review.

30 Oct. 1991.

For Appellant: Captain Michael J. Berrigan, JAGC (argued), Ted L. Potter, Esquire (on brief).

For Appellee: Major Kenneth T. Grant, JAGC (argued), Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC (on brief).

Before NAUGHTON, HOWELL, and JOHNSTON Appellate Military Judges.

## OPINION OF THE COURT

HOWELL, Judge:

A military judge sitting as a general court-martial at Fort Hood, Texas, convicted the appellant, contrary to his pleas, of attempted sodomy, indecent assault, false swearing, and communicating a threat in violation of Articles 80 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 934 (1982), respectively. The appellant's adjudged sentence included a bad-conduct discharge, confinement for seven years, forfeiture of $200 pay per month for eighty-four months, and reduction to Private E1. The convening authority approved the sentence.

Before this court, the appellant has assigned five errors through counsel and has personally asserted additional matters for consideration pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). We will address only the contention that the military judge committed reversible error by admitting and soliciting certain expert testimony.

## I.

### Factual Background

During the government's case-in-chief, the victim, SPC B, testified that she first met the appellant through a mutual friend, SPC W, one day prior to the incident. The three made plans to go bowling the next day, a Saturday. At the last minute SPC W became ill and could not go, but the appellant and SPC B went bowling together anyway in Killeen, near Fort Hood. Returning directly to Fort Hood early Saturday evening, they visited SPC W briefly, and then went to SPC B's room so the appellant could use her tape player. According to SPC B, once the two were alone in the room, the appellant began to make sexual advances toward her. He then threw her on a bed and attempted to rape and orally sodomize her. When SPC B resisted, the appellant abandoned his efforts after a brief period of time. Before leaving the room, he threatened to kill SPC B if she told anyone about the incident. SPC B testified further, that during the attack she did not scream nor call out. Moreover, she was not struck by the appellant, nor did she suffer any physical injury. After the appellant departed, she remained all night in a common area adjacent to her room, scared and crying. She did not report the incident to the authorities until the next morning, after talking to a friend who stopped by her room.

During the defense case-in-chief, the appellant told a different story. He acknowledged going bowling with SPC B and returning to her barracks room early that evening. However, he contended that he then went to a friend's house to watch television. He denied having any sexual

contact with SPC B and specifically denied sexually assaulting or threatening her.

## II.

### Expert Testimony

To establish a foundation for later expert testimony, the trial counsel questioned SPC B about the after-effects she suffered as a result of the incident. SPC B responded that she had trouble sleeping and eating, experienced nightmares and episodes of crying, no longer socialized as much as before the incident, and was afraid to be alone. Additionally, the trial counsel called SPC B's platoon sergeant and her platoon leader who testified that after the alleged incident they observed severe behavioral changes in SPC B.

Ms. Patricia LaRochelle, Sexual Assault Program Coordinator at the Killeen Rape Crisis Center, testified for the government. Over defense objection she was recognized as an expert in "sexual assault counseling." (R. 90). Ms. LaRochelle testified that she interviewed and otherwise assisted SPC B on 7 March 1990, four days after the alleged assault. She described SPC B on that occasion as shaken, withdrawn, and able to talk about the incident only with difficulty. In Ms. LaRochelle's opinion, based on her observations, the interview, and her past experience and knowledge, SPC B's behavior at the time of the interview was consistent with behavior she had observed in other sexual assault victims and behavior reported "in the literature." (R. 101). In response to questions from the military judge, Ms. LaRochelle acknowledged that she did not question SPC B's veracity, nor did she administer any psychological tests. She concluded, however, that "obviously ... in my opinion, she had been traumatized." (R. 103).

Dr. Michael Campbell, a psychologist in private practice in Killeen, testified for the government. The court recognized Dr. Campbell as an expert in "the diagnosis and treatment of female sexual assault victims, rape trauma syndrome, and post-traumatic stress disorders." (R. 112). The trial defense counsel objected only to his expertise in rape trauma syndrome. During direct examination, Dr. Campbell defined post-traumatic stress disorder (PTSD), described the relationship of rape trauma syndrome to PTSD, and concluded that attempted rape or sodomy could lead to PTSD. He testified that he generally based his diagnosis of PTSD on the results of a clinical interview, which included a Rape Aftermath Symptoms Test, and sometimes other psychological tests.

Dr. Campbell testified that he first examined SPC B on 9 May 1990, more than two months after the alleged assault. Thereafter, he observed her behavior both in his office and in a group counseling session, interviewed her for four to five hours over a three-day period, and administered a Rape Aftermath Symptoms Test. His diagnosis was that SPC B was suffering from PTSD and rape trauma syndrome. Without defense objection, the trial counsel asked Dr. Campbell during direct examination whether he believed "... that the criteria and symptoms that you've identified have been faked by [SPC B]." Dr. Campbell responded, "No, I don't believe that at all." (R. 117). In response to further questioning by the trial counsel, Dr. Campbell described the Rape Aftermath Symptoms Test he administered to SPC B:

Yes, it's a test [consisting of] lists of symptoms and the patient is asked to rate the severity with which they experience these things. For example, is it especially alarming to the woman to go into an empty parking lot, or to get on an elevator alone, or to walk into a room where everyone is sitting down; now, some of these things don't have any obvious relationship to sexual assault, but the developers of the test have empirically demonstrated that women who have been sexually assaulted tend to be more reactive to these situations. The average score for a woman who has been sexually assaulted, within one month of her sexual assault, usually scores slightly over 100 out of a possible 280 points. A woman who has never been sexually assaulted usually scores around 40. [SPC B] scored 196. (R. 118).

During examination of Dr. Campbell by the court, the military judge immediately addressed the Rape Aftermath Symptoms Test and its relation to the purported victim's credibility. Again there was no defense objection to this line of questioning.

Q: Okay now, the purpose of this test is to extract information and data from the victim, right?

A: Yes, sir.

Q: Would you, by any chance, have a copy of that test with you?

A: No, sir, not with me.

Q: Okay. Describe for me, if you would ... so that I fully understand this test ... exactly what type of test it is; what information it seeks to obtain from the victim.

A: Basically, it seeks to determine how severe the person's symptoms are. You ask them, for each statement, to rate the severity with which it bothers them, from one to four ... with four being the most severe. Now, for example: "getting into an empty elevator alone, how severely does that bother you, from one to four"; "the sight of a man's penis, from one to four"; "getting into an empty car in an empty parking lot."

Q: Okay, is it apparent to a person of reasonable intelligence as to the entire motive or intent behind each question?

A: Uh....

Q: I mean, if they have a layman's average knowledge in human behavior, would you be able to ascertain what the test was trying to ... what data the test was really trying to elicit?

A: In general, you would, but there are a couple of questions that ... for example, about hearing voices and things like that that are ... I'm not sure how they're keyed right at this moment, I'd have to look that up, but I do know that they have some questions in there that are intended to verify whether the individual is faking or not. (R. 133–34).

At the conclusion of his examination of Dr. Campbell, the military judge returned to the issue of the victim's credibility:

Q: Okay, so, from all of this information, you concluded that this particular victim was suffering from post-traumatic stress disorder/rape trauma syndrome?

A: Yes, sir.

Q: Did you see any behavior that was inconsistent with that particular diagnosis?

A: No, sir. I have had a couple of women in the past several months that I doubted the veracity of their claims but ... well, one little clue for me always is whenever they say, "I started thinking about this sequence, but I couldn't stand it and I stopped"; that kind of verifies it for me. The ones that have tried to lie to me .. or that I felt were not telling me the entire truth .. the intrusive recollections continued on for them.

Q: So, in essence, in making your diagnosis, it's imperative or important that you ascertain the credibility of the patient?

A: Well, yes, sir, but ... with little things like the one that I just described; those are things that I don't think that people can fake very easily, although maybe they can.

.    .    .    .    .

Q: You made the comment [with respect to SPC B] that this condition was not faked; does that merely relate to your conclusion that you found, I guess, a factual predicate or basis for your opinion?

A: Yes, sir.

Q: You feel it's sufficiently verified by your testing?

A: Yes, sir, I do.

Q: By your interview techniques?

A: Yes, sir.

Q: And your observation of behavior?

A: Yes, sir.

Q: Now, assuming .. I guess, just for the purpose of argument .. that a person had a motive to fabricate or a motive to lie, a person of reasonable intelligence, somewhat schooled in human behavior: would they be able to feign this condition?

A: Well, anyone can, I suppose, feign any condition, but it's probably a matter of how well they do it. She ... if she is

feigning this condition, she's doing an extremely good job of it. (R.135–137).

In his argument on findings, the trial counsel emphasized the testimony of Ms. LaRochelle and Dr. Campbell, including that concerning the Rape Aftermath Symptoms Test. During rebuttal argument, the trial counsel stressed that "Dr. Campbell, in his opinion, says that she was not faking, ..." (R. 204).

### III.

### Admissibility of Expert Testimony

■ The appellant contends that since there is no issue of consent in this case, the testimony of both Ms. LaRochelle and Dr. Campbell buttressing the credibility of SPC B, including the testimony relating to PTSD and rape trauma syndrome, was inadmissible. He contends further, that the testimony of both expert witnesses, particularly Dr. Campbell, constituted an impermissible endorsement of SPC B's credibility. We agree that the military judge erred by eliciting and considering Dr. Campbell's opinions concerning SPC B's credibility.

■ Under current military law, scientific evidence is admissible so long as the evidence satisfies the following threshold requirements: (1) the evidence is relevant (Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 401 [hereinafter Mil. R.Evid.]); (2) the expert witness is qualified to testify to matters that will assist the trier of fact in understanding the evidence or determining a fact in issue (Mil. R.Evid. 702); and (3) the probative value of the evidence outweighs the danger of prejudice (Mil.R.Evid. 403). *United States v. Abeyta*, 25 M.J. 97, 98 (C.M.A.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *United States v. Suarez*, 32 M.J. 767, 769 (A.C.M.R.1991). Once these requirements are met, expert testimony on the emotional or psychological stress symptoms typically exhibited by sexual assault victims, such as testimony describing PTSD and rape trauma syndrome, is admissible. *United States v. Carter*, 26 M.J. 428 (C.M.A.1988) (rape trauma syndrome); *United States v. King*, 27 M.J. 545

(A.C.M.R.1988), *aff'd on rehearing*, 28 M.J. 855 (A.C.M.R.1989), *review denied*, 29 M.J. 329 (C.M.A.1989) (post-traumatic stress disorder); *Suarez*, 32 M.J. at 769. However, two critical restrictions limit the scope of such testimony. First, the sexual assault expert cannot improperly express an opinion concerning the believability or credibility of victims or other witnesses. *United States v. Petersen*, 24 M.J. 283, 284 (C.M.A.1987); *United States v. Arruza*, 26 M.J. 234, 237 (C.M.A.1988), *reconsideration denied*, 27 M.J. 321 (C.M.A.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989); *United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *Suarez*, 32 M.J. at 769; *United States v. Savage*, 30 M.J. 863, 865–66 (N.M.C.M.R.1990), *review denied*, 32 M.J. 42 (C.M.A.1990); *State v. Taylor*, 663 S.W.2d 235 (Mo.1984); *see also* Annotation, *Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome*, 42 A.L.R. 4th. 879 (1985). Secondly, opinion testimony that the expert believes a sexual assault actually occurred is also prohibited. *Savage*, 30 M.J. at 865–866.

■ Turning to the case at hand, we reject the appellant's contention that PTSD evidence is admissible only for the limited purpose of rebutting a defense of consent. Rather, we conclude that an expert in sexual assault counseling or post-traumatic stress disorders may testify as to the psychological or emotional trauma that an alleged sexual assault victim exhibits, and as to whether the victim's behavior is consistent or inconsistent with the behavior expected of a sexual assault victim. *See Savage*, 30 M.J. at 865.

However, we conclude that Dr. Campbell impermissibly expressed an opinion concerning the victim's credibility in two ways: (1) through his testimony about the Rape Aftermath Symptoms Test and SPC B's performance on it; and (2) through his statements that SPC B did not "fake" or "feign" her condition.

We are particularly concerned about the testimony relating to the Rape Aftermath Symptoms Test. Very little information was offered to support the validity of this

test. Based on the record, the test fails to meet the threshold requirements for the admissibility of scientific testimony. Nevertheless, the trial counsel was allowed to present evidence of SPC B's performance on this test during his case-in-chief. In effect, the prosecution was allowed to produce a human lie detector, in the person of the doctor, who improperly gave a stamp of scientific legitimacy to the truth of SPC B's factual testimony about the alleged sexual assault. *People v. Izzo*, 90 Mich. App. 727, 282 N.W.2d 10, 11 (1979).

Dr. Campbell's statements to the military judge that SPC B did not "fake" or "feign" her symptoms or condition had the same legitimizing effect. As Chief Judge Everett has observed, "[t]o allow an 'expert' to offer his opinion on the resolution of a credibility dispute goes too far, and it makes no difference whether the opinion is express or follows inferentially from the expert's diagnosis of a psychological condition suffered by the witness whose credibility is at issue." *United States v. Cameron*, 21 M.J. 59, 64–65 (C.M.A.1985). Viewed in this light, Dr. Campbell's opinion that SPC B was not faking amounted to an unwarranted yet critical reinforcement of SPC B's testimony. *Izzo*, 282 N.W.2d at 11.

### IV.

### Lack of Defense Objection

### Plain Error

Government counsel contends that even if the military judge erred by admitting and considering the offending portions of Dr. Campbell's testimony, the error was waived by the trial defense counsel's failure to object. Mil.R.Evid. 103(a)(1). Government counsel contends further, that any error in the admission of Dr. Campbell's opinion testimony was not plain error. Mil.R.Evid. 103(d). We disagree.

▇▇▇ To constitute plain error, the error must not only be both obvious and substantial, it must also have had an unfair prejudicial impact on the trier of fact's deliberations. *United States v. Fisher*, 21 M.J. 327, 328 (C.M.A.1986); *United States*

*v. Young*, 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985). Under the particular circumstances of this case, we believe that plain error did occur, for the following reasons. First, the case law at the time of trial was clear and well-established that an expert witness would not be allowed to express an opinion concerning the believability or credibility of victims or other witnesses. Secondly, the military judge nevertheless directly addressed this prohibited area during his examination and actively elicited improper opinion evidence. Thirdly, the evidence against the appellant was not overwhelming. Indeed, the prosecution's case was weakened by the absence of any eyewitnesses or fresh complaint by the victim, and the lack of any evidence of injury to the victim or other physical evidence to support her story. Expert testimony by Ms. LaRochelle and Dr. Campbell was vital to the government's effort to corroborate SPC B's version of the alleged assault. The emphasis given their testimony during the trial counsel's findings argument demonstrates this critical link. Fourthly, when examined in the context of the government's evidence, Dr. Campbell's expert opinion concerning SPC B's credibility played a major rather than a minor role in substantiating the appellant's guilt. Clearly, the resolution of the credibility standoff between SPC B and the appellant stood at the heart of the case. *See Cameron*, 21 M.J. at 66. Dr. Campbell's conclusion, cloaked in the respectable aura of expert medical opinion, vouched too much for the victim's credibility and supplied the appearance of truth for her on the critical issue of whether the appellant did sexually assault her. *Taylor*, 663 S.W.2d at 240.

Based on the record, we believe there is a substantial risk that the military judge was unduly influenced by, and relied too heavily on, the inadmissible expert testimony. *Cameron*, 21 M.J. at 66. For this reason and the additional reasons noted above, we conclude that this error substantially prejudiced the appellant's right to a fair hearing. Since all the offenses of which the appellant was convicted are directly tied to the

issue of SPC B's credibility, we must set aside all the findings of guilty.

Because of our resolution of this issue, we need not address the appellant's other assignments of error or his *Grostefon* assertions.

The findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority.