UNITED STATES

v.

David W. HAIRE, Chief Yeoman,
U.S. Coast Guard Reserve.

Docket No. 1012.

U.S. Coast Guard Court of
Criminal Appeals.

29 March 1996.

Trial Counsel: LCDR Frederick J. Kenney, USCG.

Detailed Defense Counsel: LT Anthony J. Antonellis, JAGC, USNR.

Appellate Defense Counsel: LCDR Allen Lotz, USCG.

Appellate Government Counsel: LCDR Charles Bennardini, USCG.

Before Panel Five, BAUM, FEARNOW and WIESE, Appellate Military Judges.

FEARNOW, Judge:

On November 20, 1992, a general court-martial consisting of officer and enlisted members found appellant guilty, contrary to his plea, of one specification of rape, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. Appellant was sentenced to reduction to pay grade E–1, and to be discharged with a bad-conduct discharge. The convening authority approved the sentence as adjudged and ordered it executed, except for the bad-conduct discharge.

The case was initially referred to this Court on May 12, 1993. After the filing of briefs and oral argument, we set aside the convening authority's action and returned the record for a new action. *United States v. Haire*, 40 M.J. 530 (C.G.C.M.R.1994). The convening authority took action again on January 12, 1995 and again approved the sentence as adjudged. The record was referred to us a second time, supplemental briefs were filed and a second oral argument was held.

On this "second" appeal, appellant presents nine assignments of error.[1] Finding no merit in any of them, we affirm the findings and sentence.

### The Material Facts

At the time of the offense, the appellant, a Chief Petty Officer (E–7), was assigned as the assistant administrative officer at Coast Guard Reserve Unit Captain of the Port, Portland, Maine. The records for the reservists assigned to the appellant's unit were maintained at the Reserve Branch of the First Coast Guard District in Boston. Yeoman Third Class (YN3) B, the victim in this case, was assigned to the District Reserve Branch where her duties included maintenance of reserve members' records. Her duties routinely required contact with the administrative officers at the reserve units for which she was responsible.

It was in this way that YN3 B and appellant first became acquainted. Initially, their

---

1. In his initial brief, appellant listed ten assignments of error. In his supplemental brief, submitted after the convening authority's second action, the appellant withdrew original assignments IX and X and submitted an additional assignment of error he numbered XI. Thus the assignments of error now before us are as follows:

  I. THE EVIDENCE IS NOT SUFFICIENT TO SUSTAIN THE CONVICTION OF RAPE.

  II. THE BAD–CONDUCT DISCHARGE IN THIS CASE MUST BE SET ASIDE BECAUSE THE RECORD OF TRIAL DOES NOT CONTAIN A VERBATIM TRANSCRIPT OF ALL THE PROCEEDINGS.

  III. THE MILITARY JUDGE ERRED BY PERMITTING A GOVERNMENT WITNESS TO REMAIN IN THE COURTROOM AND SIT WITH THE TRIAL COUNSEL THROUGHOUT THE TRIAL WITHOUT REQUIRING THAT WITNESS TO TESTIFY FIRST IN THE GOVERNMENT'S CASE.

  IV. THE MILITARY JUDGE ERRED BY ALLOWING THE GOVERNMENT TO INTRODUCE IRRELEVANT AND INFLAMMATORY TESTIMONY CONCERNING THE COLLECTION OF PHYSICAL EVIDENCE.

  V. THE MILITARY JUDGE ERRED BY PERMITTING THE TRIAL COUNSEL TO ADVISE THE COMPLAINING WITNESS DURING A BRIEF RECESS DURING HER TESTIMONY.

  VI. IMPROPER AND HIGHLY INFLAMMATORY QUESTIONS BY THE TRIAL COUNSEL DURING CROSS EXAMINATION OF APPELLANT DENIED APPELLANT A FAIR TRIAL.

  VII. THE CUMULATIVE EFFECT OF ERRORS III THROUGH VI DENIED APPELLANT A FAIR TRIAL.

  VIII. THE GENERAL COURT–MARTIAL MILITARY JUDGE AND THE JUDGES OF THIS COURT WERE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. (Citations omitted.)

  IX. (Withdrawn)

  X. (Withdrawn)

  XI. THE CONVENING AUTHORITY ERRED BY REFUSING TO MEET WITH APPELLANT AND HIS COUNSEL AS REQUESTED.

contact was by telephone only. Then, in February of 1991, they met in person when YN3 B travelled to Maine under temporary duty orders. After meeting the appellant, YN3 B found herself attracted to him and their relationship continued through phone conversations that were usually initiated for business reasons but often became "flirtatious." Eventually, appellant planned a trip to Boston to train with the District Reserve Branch on matters related to his duties at his reserve unit. The trip was scheduled for November 6–7, 1991. In making arrangements for the trip, appellant let it be known to YN3 B that he would prefer not to have to stay in the enlisted barracks at Coast Guard Base Boston that would normally be the quarters available for TDY personnel. YN3 B then invited appellant to stay in her off-base apartment while he was in Boston.

The appellant arrived at YN3 B's apartment late on the evening of November 5. He immediately called his wife to inform her that he had arrived safely and that he was staying in the Support Center Boston barracks, notwithstanding his actual location at YN3 B's residence. That night he slept on the couch in the living room of the two bedroom apartment YN3 B shared with another Coast Guard member. The following morning they rode the train together to the District Office and worked together in the same office space but not with each other. After work, appellant went to a nearby restaurant with a group from the District Office that occasionally went there after work for drinks and chicken wings. YN3 B was a member of the group. At about 2130, appellant and YN3 B left the restaurant and returned to her apartment. They sat together on the couch kissing and eventually went into the bedroom where YN3 B put on a negligee and lit a candle. They engaged in consensual intercourse and then slept together in YN3 B's bed. In the morning they again went into work on the train together and returned to the apartment at the end of the work day. At the apartment, appellant and YN3 B en-gaged in consensual intercourse before the appellant departed to return to his home in Maine.

The day after appellant left, YN3 B sent him a card thanking him for the visit. YN3 B later had feelings of guilt about sleeping with a married man, but their telephone relationship continued essentially as it was before the visit.

In March of 1992, appellant arranged for another trip to train in the District Office. He again indicated to YN3 B that he would prefer not to have to stay in the barracks. YN3 B, feeling some pressure from the appellant, invited him to stay at her apartment but made it clear that he would be sleeping on the couch for the entire visit. At this time, YN3 B was in a relationship with a boyfriend named Sean. Upon arriving at the apartment late on March, 24, appellant again called his wife at home in Maine to advise her he had arrived at the barracks safely. YN3 B helped make up the couch for appellant to sleep on and retired to her bedroom. Appellant called to YN3 B from the couch in the living room asking if she would like him to come into her bedroom. YN3 B answered, "No. Good night," whereupon appellant went to sleep.

The next day followed the same pattern as that of appellant's November visit in many respects. YN3 B and appellant rode the train to work together, performed their respective tasks in the District Reserve Branch and then went out with some co-workers for drinks and chicken wings at the same restaurant. Before leaving work, YN3 B called her boyfriend Sean and asked him to meet them at the restaurant but he was unable to because of work. Appellant and YN3 B left the restaurant around 2130 and returned to her apartment on the train. YN3 B testified that by the time they left she was "pretty drunk" and did not remember anything about the ride home.[2] YN3 B remembers arriving at the apartment and seeing her roommate's fiancee, FN A, watching television. FN A

---

**2.** Appellant testified that while at the restaurant and during the train ride home, YN3 B intimated that she was interested in having sexual relations with him that evening, e.g. she told him "something to the effect that he had to take care of her that night ... it's your job tonight if you want it." Given our ultimate conclusion as to YN3 B's lack of consciousness at the time of entry by the appellant, infra., these statements would be irrelevant, even if made.

testified he thought YN3 B was drunk when she entered the apartment. After a short exchange of small talk, she went to her room where she made a phone call in an attempt to reach Sean. She then laid down on her bed and both FN A and the appellant, who were watching television, could see through her open bedroom door, that YN3 B was lying on her back, fully clothed, with the bedroom light on. In FN A's words "she was asleep or passed out." At this point, YN3 B's and appellant's recollections become irreconcilable.

YN3 B said that after laying down on the bed, the next thing she remembered is being awakened by appellant having intercourse with her. She immediately told appellant to stop, which he did. Appellant asked YN3 B "do you realize what we just did?" She gave no clear response in her confused state but began crying and cleaning up the bed.

On the other hand, appellant's recitation of the events occurring from the time YN3 B was observed passed out on her bed, until she told him to stop having intercourse, is much different and more specific than YN3 B's. Appellant testified that after FN A went to sleep in the other bedroom, appellant entered YN3 B's room intending to help her get into bed properly but with the additional thought ". . . if it [sex] happened, fine; if not . . ." He woke her and asked if she wanted help getting into bed and she said yes. Appellant then undressed her and asked her if she wanted him to sleep with her to which she answered yes. After kissing for a while, she removed his underwear, as he asked her to do, and he removed the tampon she was wearing and dropped it on the floor at the side of the bed. They then had intercourse. After intercourse, appellant noticed that YN3 B "seemed really out of it" and he asked her if she knew what she had just done. According to appellant, she replied "[O]f course silly."

The significant events occurring from this point are again largely undisputed. The bedroom was straightened up but the sheets with menstrual blood stains were not removed. YN3 B told appellant to leave the bedroom but that he could stay on the couch. She telephoned her boyfriend Sean and asked him to come over and then took a shower. It was while she was in the shower that she realized she had been raped. Sean arrived at the apartment and observed the appellant asleep on the couch in the living room and YN3 B, having completed her shower, sitting on her bed with a book. YN3 B appeared confused and distraught but was reluctant to say what was bothering her and started crying. She finally told him, "I think I've been raped." Sean and YN3 B left the apartment and went to the Revere police station where she reported the rape. The police recommended she go to a local hospital for a rape protocol which she did. At her request, the police went to her apartment and told appellant to vacate it and they escorted him to the station where he gave a statement. Approximately two months later, YN3 B reported the rape to the Coast Guard.

### Sufficiency of the Evidence

■ In his first assignment of error, the appellant challenges the legal and factual sufficiency of the evidence to support the finding of guilty to rape. The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). To find the evidence factually sufficient we, ourselves, having weighed the evidence in the record of trial and making allowances for not having personally observed the witnesses, must be convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

■ The appellant contends that the elements of force and lack of consent were not established or alternatively, that he was acting pursuant to a reasonable but mistaken belief that YN3 B had consented to intercourse. The essence of appellant's version of events is that it was purely consensual intercourse. He awoke YN3 B and spoke to her. With her full understanding and willing participation, he undressed her. She verbally asked him into bed and then asked him to have intercourse. She removed his underwear, as he requested, and they had sex. If

the events had actually transpired in this manner, we do not believe that a mistake of fact defense would even be raised. If appellant's version was accepted, the fact-finder at trial would not have come to any conclusion other than that YN3 B consented to intercourse with the appellant. Similarly, we ourselves, if we accepted the appellant's testimony, would conclude that YN3 B's conduct was indeed consensual. If the appellant's testimony is believed, an acquittal would follow without any need to consider a claim that he mistakenly believed YN3 B consented to intercourse when she actually had not.

■ Conversely, YN3 B's testimony leads just as directly to the opposite result. She says she was asleep or unconscious from the time she lay down on the bed after returning to the apartment, until she awoke, or came to, with appellant inside of her. Consent to rape may not be inferred where the victim is unable to resist because of the lack of mental or physical facilities. In such case, there is no consent and the force element of the offense is established by penetration alone. Para. 45 c.(1)(B), Part IV, M.C.M.; *United States v. Palmer*, 33 M.J. 7, 9 (C.M.A.1991). (Force component of rape is established by penetration alone if victim is incapable of consenting because she is asleep or unconscious.) Cases such as this, where the victim and accused are the only witnesses to the critical events and each relates conflicting testimony, always present difficult questions for the fact-finder. In the end, it is a question of credibility and whether the credible testimony, in conjunction with any corroborating evidence, sustains the burden of proof. When the case involves a charge of rape and the victim and perpetrator are not only acquaintances, but also have previously had consensual intercourse, resolving contradictory testimony critical to the element of lack of consent, becomes even more difficult. The members were free to reject YN3 B's version in favor of the appellant's. They did not however and we find the evidence to be legally sufficient to support their determination that YN3 B did not give her consent.

In addition, we ourselves have carefully considered all the evidence of record and we are convinced beyond a reasonable doubt of appellant's guilt. We find particularly important the testimony relating to YN3 B's tampon. Appellant stated that "in the heat of passion," he removed it from YN3 B's vagina and then dropped it on the floor beside the bed. Neither he nor YN3 B took any precautions to protect the bed sheets or the floor from staining by menstrual blood. It is contrary to common experience, as well as to YN3 B's practice, according to her testimony, that a woman who is sufficiently conscious and aware to consent to intercourse, and to engage in the conversation and activity described by appellant immediately prior to doing so, would first allow a man to remove the tampon from her vagina and then deposit it on the floor without taking any precautions to prevent staining the floor and bed. We reject appellant's version and find instead that YN3 B was not conscious or awake when appellant removed the tampon and dropped it on the floor. If YN3 B had been awake at this time, we believe she would have followed her normal practice and gone to the bathroom to remove and dispose of the tampon. Thus appellant's testimony that YN3 B was awake and conscious, is contradicted by the presence of the tampon on the floor when the intercourse was ended.

■ We also note that YN3 B was diagnosed with post-traumatic stress disorder (PTSD) after the reported rape. PTSD (often classified as rape trauma syndrome in cases of rape) is probative and admissible evidence in rape cases and is particularly relevant where consent is an issue. Military Rules of Evid., Rules 401–403, 702, *United States v. Carter*, 26 M.J. 428 (C.M.A.1988), *United States v. Savage*, 30 M.J. 863 (N.M.C.M.R.1990), *review denied*, 32 M.J. 42 (C.M.A.1990), *United States v. Bostick*, 33 M.J. 849 (A.C.M.R.1991). While PTSD can be precipitated by a variety of traumatic events, the fact that YN3 B's post-intercourse actions were consistent with PTSD indicates the event was traumatic, not the reaction you would expect from consensual sex. YN3 B did not display any PTSD symptoms prior to the rape. Her desire to immediately shower and clean herself, straighten the room, and her crying and con-

fusion following the rape, are consistent with a PTSD "controlled response" diagnosis.

Appellant made much of the fact that on his first stay at YN3 B's apartment she readily consented to twice having sex with him and that this supports his contention that she also consented during the second (March, 1992) visit. We disagree. YN3 B's conduct during the second visit was markedly different from the first. This time she was involved with another man. She told appellant when she agreed to let him stay in the apartment a second time, that he would have to sleep on the couch. When appellant arrived at her apartment from his home, she gave a unequivocal "no" answer to his question of whether he could sleep with her. She tried (unsuccessfully) to invite her boyfriend with the group going to the restaurant after work. Upon returning to her apartment from the restaurant, she almost immediately went to her room where she passed out on her bed fully clothed. In contrast, during the earlier visit, she and appellant sat on the couch together kissing before she changed into her negligee and invited him into the bedroom. To us, YN3 B's conduct during the second visit clearly indicated that she was not interested in anything other than a platonic relationship with the appellant. Under the circumstances, appellant's uninvited entry into YN3 B's bedroom while she was asleep, with the stated purpose of helping her to bed, but with the anticipation of sex, was unwarranted. He certainly had no valid basis to assume he was welcome to stay anywhere other than on the living room couch as YN3 B had made clear the evening before.

Another item we found telling in evaluating the testimony of appellant was that he so casually and openly lied to his wife when he twice told her over the phone that he had arrived at the Coast Guard barracks in Boston when he was instead staying at the apartment of YN3 B. There was also testimony from the supervisor of the appellant in a former civilian job that characterized him as untruthful. The supervisor directly observed the appellant on a daily basis for over 18 months. This evidence indicates to us, as we are sure it did to the members, that the appellant has a demonstrated ability to lie when he perceives it to be in his best interest. All of the above, in conjunction with the other evidence, tends to corroborate YN3 B's version of events and convinces us of the appellant's guilt beyond a reasonable doubt. YN3 B's testimony, that she was asleep or unconscious when appellant engaged in intercourse with her, is more believable and more in line with the uncontradicted facts, than the appellant's testimony that she was awake and willingly participated in consensual sex.

## Verbatim Record

■ Assignment of error II asserts that there were so many minor omissions and discrepancies in the transcript of the trial testimony that the record cannot be considered verbatim as is required by Article 54 UCMJ in cases where a punitive discharge is adjudged. We do not believe that any of the omissions, individually or taken together are substantial or preclude review of the record on appeal. "Insubstantial omissions from a record of trial do not affect its characterization as a verbatim transcript." *United States v. Boxdale*, 22 USCMA 414, 415, 47 CMR 351, 352 (1973). The record therefore is "substantially verbatim" and complies with the requirements of Article 54. *United States v. Gray*, 7 M.J. 296 (C.M.A.1979), *United States v. Lashley*, 14 M.J. 7 (C.M.A. 1982). *United States v. Norris*, 33 M.J. 635 (C.G.C.M.R 1991) *United States v. Stewart*, 29 M.J. 621 (C.G.C.M.R 1989).

## Trial Procedural Matters

Assignments III through VII allege various minor procedural errors in the trial. We do not agree that any of the items complained of were error. The actions of the military judge were all within his discretion and any possibility of an improper impression on the members was corrected by the appropriate curative instructions.

## Qualification of Judges

In assignment VIII, appellant asserts that the trial judge, and the judges of this court, were appointed in violation of the appointments clause of the constitution. The validity of the appointments of the trial and appellate judges who are active duty commissioned officers was settled in *Weiss v.*

*United States,* 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). With respect to Chief Judge Baum's service on this court, he was constitutionally appointed by the Secretary of Transportation on 15 January 1993. *United States v. Carpenter,* 37 M.J. 291, 294 (CMA 1993); *United States v. Washington,* 43 M.J. 840 (C.G.Ct.Crim.App. 1996). *United States v. Hill,* 42 M.J. 725 (C.G.Ct.Crim.App.1995).

### Post Trial Procedures

In the final assignment of error, appellant, citing *United States v. Davis,* 33 M.J. 13 (C.M.A.1991), contends that it was improper for the convening authority to refuse to personally meet with him and his counsel before taking action on the findings and sentence. In *Davis,* the convening authority refused to consider a video tape included in a clemency petition. The Court of Military Appeals indicated that Article 60(b)(1) of the UCMJ permits the accused to submit "matters" for the convening authority's consideration prior to taking action, and it does not limit the submission to written matters. The Court held that the convening authority should have "considered" the video tape but that there was no requirement that it be reviewed "minute-by-painful-minute." *Davis,* at 15–16.

While a video tape has certain attributes that are similar to a personal "live" appearance of an accused before the convening authority, we do not believe that a personal appearance qualifies as "matter" as the term is used in Article 60(b)(1). Senior Judge Everett said in *Davis* that:

> "Matters" is a broad term which would include almost any *item.* "Submission" is an equally broad term; and it would seem to apply to anything which an accused *sends* to a convening authority.

*Davis* at 15, (emphasis added). Clearly the accused's person, while it may be "matter" is more than a mere "item" that can be "sent" to the convening authority. The term as used in the context of the convening authority's post-trial duties, must be limited to "inanimate" matter that can be appended to a clemency request. We specifically reject the contention that a petitioner for clemency has a non-discretionary right to personally appear before the convening authority.[3]

The findings of guilty and the sentence, as approved by the convening authority, are approved.

Chief Judge BAUM and Judge WIESE concur.

---

**3.** Obviously, a convening authority is free to grant such a request should he or she be inclined to do so.