**UNITED STATES**

v.

**Airman First Class Johnny D. FORD,
FR 439–29–9971, United States
Air Force.**

**ACM 27930.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 28 March 1989.

Decided 13 April 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Mark R. Land.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie, Captain Morris D. Davis and Captain James C. Sinwell.

Before HODGSON, FORAY, BLOMMERS, SPILLMAN, LEONARD, KASTL, MURDOCK and PRATT, Appellate Military Judges.

### DECISION

LEONARD, Judge:

Contrary to his pleas, appellant was convicted of stealing over $4,200 from the billeting office at Altus Air Force Base, Oklahoma and using and distributing cocaine. He was sentenced to a bad conduct discharge, confinement for 30 months, forfeiture of $466.00 pay per month for 30 months and reduction to airman basic. On appeal, six errors are asserted for our con-

sideration. We find merit in only one of the assertions.

■ The first assertion is that the funds the appellant is convicted of stealing were not military property of the United States. The specification alleging this theft offense, in violation of Article 121, UCMJ, 10 U.S.C. § 921, contained the allegation that the funds stolen were military property. By alleging the offense in this manner, the maximum confinement allowed for a larceny of over $100 was increased from five years to ten years. MCM, Part IV, paragraph 46 e(1)(c).

The appellant was a billeting clerk at the registration desk of the base billeting office. As part of his duties, he collected daily room occupancy assessments and service charges from guests who were paying to stay in billeting facilities. The funds were collected in both cash and checks and, at the end of each day, were deposited in a Nonappropriated Fund Instrumentality (NAFI) account with a local bank.

The funds generated by NAFIs are set apart to support NAFI programs and activities. Such funds are in the custody of and administered for the benefit of military personnel, their dependents, and eligible civilian personnel. NAFI generated funds are government funds separate and apart from funds appropriated by Congress. *See* Air Force Regulation 176–1, *Nonappropriated Funds, Basic Responsibilities, Policies, and Practices*, paragraph 1–1 (Mar 1986). NAFIs include a number of varied activities established to create and maintain high morale and well-being of military personnel, dependents and eligible civilian personnel including: officer and enlisted clubs, Class VI alcoholic beverage outlets, Aero Clubs, the Army and Air Force Exchange Service (AAFES), and temporary lodging and billeting operations. AFR 176–1, chapters 3 and 4.

The funds generated by temporary lodging and billeting operations are kept separate from other NAFI operations. Both temporary lodging facilities and billeting facilities are operated on a self-sustaining basis. The funds collected from guests staying at these facilities are used to cover operating expenses, repay loans for improvements to facilities, and provide for supplies and planned capital improvements that are not available from appropriated funds. AFR 176–1, paragraphs 4–14 and 4–16; Air Force Regulation 90–9, *Unaccompanied Personnel Housing and Temporary Lodging Facilities*, paragraph 4–8 (Mar 1989).

Basic support of billeting and temporary lodging operations is provided by appropriated funds. Appropriated funds provide for construction of buildings, furnishings, supplies, maintenance and linens. AFR 90–9, paragraphs 6–3b and 6–6a. NAFI funds may be used for minor capital improvements to buildings and basic support costs on a very limited basis only when appropriated funds are not available. *Id.* Nonappropriated funds (NAF) may be used to supplement appropriated funds by buying furnishings and amenities that improve the quality of services, such as, televisions, cable television services, and telephone systems. AFR 90–9, paragraph 6–6a. An individual's eligibility to occupy temporary lodging or billeting facilities is based on their status as an active duty military member, a military dependent, or a Department of Defense civilian employee and not their relationship to the military mission of the base where the facilities are located. AFR 90–9, paragraph 4–2. Further, retirees, military personnel in leave status, and their dependents are entitled to billeting or temporary lodging when space is available. *Id.*

For a definition of "military property of the United States" subject to a larceny, the Manual for Courts-Martial refers to the definition provided for the offense of wrongfully disposing of military property in violation of Article 108, UCMJ, 10 U.S.C. § 908. MCM, Part IV, paragraph 46 b(1) (1984). This definition provides:

> Military property is all property, real or personal, owned, held, or used by one of the armed forces of the United States.... Retail merchandise of service exchange stores is not military property under this article.

MCM, Part IV, paragraph 32 c(1). According to the drafters, the first sentence of this definition was based upon MCM, paragraph 187, (1969 Rev.) and a number of Courts of Military Review cases. The last sentence was based upon *United States v. Schelin*, 15 M.J. 218 (C.M.A.1983). MCM, App. 21, paragraph 32 c (1984).

Historically the courts of review have been split over whether NAF property was "military property of the United States." The Army and Air Force courts have held that NAF property was not military property. *United States v. Schelin*, 12 M.J. 575 (A.F.C.M.R.1981) (AAFES NAF property held for retail sale); *United States v. Underwood*, 41 C.M.R. 410 (A.C.M.R.1969) (AAFES NAF property held for retail sale); *United States v. Geisler*, 37 C.M.R. 530 (A.B.R.1966) (property of an officers' open mess) Navy cases have held otherwise. *United States v. Harvey*, 6 M.J. 545 (N.C. M.R.1978) (Navy exchange property); *United States v. Mullins*, 34 C.M.R. 695 (N.B.R.1964) (Navy exchange vending machines).

Article 108, UCMJ was derived from Articles of War 83, 84 and part of 94. Legal and Legislative Basis, Manual for Courts–Martial, U.S., 1951, at 198. Article of War 83 covered loss, damage or wrongful disposition of "military property belonging to the United States." Such property was defined as property of a "type and kind issued for use in, or furnished and intended for the military service." MCM, U.S. Air Forces, paragraph 171 (1949).

Article of War 84 covered selling or wrongfully disposing of "property issued for use in the military service." The offenses prohibited by Article of War 94 included stealing, larceny [1], embezzlement, misappropriating, misapplication, sale and wrongful disposition of "property of the United States furnished or intended for the military service." Paragraph 181h of the Manual for Courts–Martial, U.S. Air Forces, 1949 explained that:

> To be the subject of an offense within this article (Article of War 94), the property must be that 'of the United States furnished or intended for the military service thereof.' This does not include post exchange, company, or officers' club funds or property or money appropriated for other than the military service.

Thus, it is clear that, under the Articles of War, theft of NAF property or funds could not have been the subject of a larceny of "military property of the United States." Although subsequent versions of the Manual for Courts–Martial have not contained the above explanation provided in the 1949 version, subsequent case law definitions of military property have maintained a narrow view of the types of property covered. Part of the reason for maintaining this narrow view is the fact that Article 108, UCMJ, criminalizes negligent conduct in dealing with such property and, absent such criminalization, recourse would be generally limited to civil law remedies. [2] *See United States v. Schelin*, 15 M.J. 218, 220 (C.M.A.1983).

The Army Board of Review, in the *Geisler* case, applied two tests to determine whether an item is "military property of the United States:"

> First, all property owned by a military service of the United States is military property of the United States. Second, all property, no matter who owns it,

---

1. The Articles of War were superseded by the UCMJ and, after the effective date of the UCMJ, there was no longer a separate offense of larceny of military property of the United States. This was true until the effective date of the 1984 Manual For Courts–Martial where a provision was included to increase the maximum punishment when the property that was the subject of the larceny is military property of the United States. MCM, Part IV, paragraph 46 e (1984).

2. Although this rationale does not apply when the offense is larceny of military property, as it is in this case, the definition of military property that applies to larceny cases is the same one that applies to Article 108 offenses. MCM, Part IV, paragraph 46 b(1). Further, we are relying on this definition to afford a special protective status to military property to justify doubling the maximum term of confinement of the thief who stoops so low as to steal "military property of the United States." Therefore, a similar rationale would seem to apply, i.e. we should strictly limit the types of property warranting this substantial increase in maximum punishment.

which is furnished to and intended for use by a military service of the United States is military property of the United States.

*Geisler*, 37 C.M.R. at 532.

Applying this test to the property of an officers' open mess, the Board found first that the property was owned by a NAFI and not a military service. Second, they found that the property was not furnished to a military service for the use of such service. The property in question was, until it was stolen, in the possession of the NAFI and was being used exclusively for the NAFI's purposes. 37 C.M.R. at 532.

In the *Schelin* case, Judge Cook found that for property of the United States to be entitled to the special protective status of "military property" it must meet at least one of two criteria:

[I]t is either the uniquely military nature of the property itself, or the function to which it is put, that determines whether it is 'military property' within the meaning of Article 108.

*Schelin*, 15 M.J. at 220.

In *Schelin*, Judge Cook applied this criteria to retail merchandise of the AAFES and stated that he agreed with the majority of the Air Force Court of Review that the property was not "military property of the United States." The Court of Review had decided, after reviewing the historical precedent, that the items in question were not military property because they were owned by the AAFES, a NAFI, and had not been furnished to a military service for its use. *Schelin*, 12 M.J. at 578.

Although Judge Cook's *Schelin* decision only applied the NAF rationale by the implication of referral to the lower court decision, a later case more clearly made the distinction. In the case of *United States v. Simonds*, 20 M.J. 279 (C.M.A.1985), the Court held that property purchased with appropriated funds by the Navy Supply Corps for sale in a ship's store was "military property of the United States." 20 M.J. at 280. The Court stated that the "significant factual difference" was the items were purchased by an "appropriated-fund activity" and that:

[I]tems purchased with funds appropriated by Congress to a military department fall within the definition of 'military property.'

20 M.J. at 280.

Applying the law to the facts of this case, we find that the billeting funds the appellant is convicted of stealing were not "military property of the United States." These funds were collected by a NAFI and were owned by that NAFI which maintained them in a separate NAFI account in a commercial bank. The funds were not available to commanders or other military personnel for whatever use they deemed appropriate. Use of the funds was limited by regulation to specific purposes in support of the NAFI base billeting and temporary lodging activities. These nonappropriated funds were never owned, held or used by an armed force of the United States and they were not furnished to such an armed force for its use. *Schelin*, 12 M.J. at 578; *Geisler*, 37 C.M.R. at 532; MCM, Part IV, paragraph 32 c(1) (1984). Further, the stolen funds were not of an unique military nature or put to a military function that would entitle them to the special protection accorded "military property of the United States." *Simonds*, 20 M.J. 279; *Schelin*, 15 M.J. 218.

■ In his second assertion of error, appellant claims that the government did not establish beyond a reasonable doubt that he stole the billeting funds. He contends the prosecution's case is circumstantial in nature and "primarily based upon assumptions and innuendo" and other reasonable theories exist of how the money disappeared rather than him taking it. We disagree.

■ The appellant had the opportunity and the motive to take the money. The evidence showed he offered three different versions of what happened to the money that all proved to be false. The trial judge saw and heard the appellant testify that he did not take the money and she heard the other evidence in the case. As the trier of fact, she had the discretion to determine the appropriate weight to accord each item

of evidence. *United States v. Lecappelain*, 9 M.J. 562 (A.F.C.M.R.1980). Proof beyond a reasonable doubt does not mean the evidence must be free of conflict. *United States v. Lips*, 22 M.J. 679 (A.F.C.M.R.1986). The mere fact that the evidence is circumstantial does not mean that a higher standard of proof is required. *United States v. Gammill*, 13 M.J. 966 (A.F.C.M.R.1982).

After examining the record of trial, we are convinced, as was the court below, that appellant's guilt of the theft of the billeting funds was proven beyond a reasonable doubt. However, because of our finding that the billeting funds were not "military property of the United States," we affirm only so much of the Specification of Charge III that finds the appellant guilty of stealing cash and checks of a value of about $4,200.00, property of the United States.

The remaining assigned errors are resolved against the appellant. *United States v. Pollard*, 27 M.J. 376 (C.M.A. 1989); *United States v. Tyler*, 17 M.J. 381 (C.M.A.1984); *United States v. Hudson*, 20 M.J. 607 (A.F.C.M.R.1985), *pet. denied* 21 M.J. 32 (C.M.A.1985); *United States v. Davis*, 14 M.J. 628 (A.F.C.M.R.1982), *pet. denied* 15 M.J. 69 (C.M.A.1982).

■ For the reasons stated previously, we find appropriate only so much of the sentence as provides for a bad conduct discharge, 20 months confinement, forfeiture of $466.00 per month for 20 months, and reduction to airman basic. The findings of guilty and the sentence, both as modified, are

AFFIRMED.

Senior Judges FORAY and KASTL and Judge MURDOCK concur.

Chief Judge HODGSON (concurring in the result):

I am in full agreement with the majority's disposition of this case. However, I would *go* farther and hold that while money buys weapons and material which become military property, the money itself does not attain that status. Thus, it's nature as appropriated or non-appropriated funds is immaterial, and a nexus must exist between the property alleged as military in nature and its intended use by the military.

At trial the prosecution successfully maintained that while money and commercial paper themselves are not uniquely military in nature, the purpose to which they are put can cause them to be classified that way. It was argued that the money paid by billeting patrons is used for the upkeep of on-base billeting quarters that house military personnel which, in turn, plays a key role in accomplishing the Air Force mission. *Ergo*, the missing funds were military property. This is an ingenious argument, but I cannot accept it. I take a narrower view of what constitutes "military property." *See United States v. Schelin*, 12 M.J. 575 (A.F.C.M.R.1981), *aff'd* 15 M.J. 218 (C.M.A.1983).

One final comment. Larceny of military property of a value of more than $100.00 is punishable by a dishonorable discharge, total forfeitures, and *10* years confinement whereas theft of non-military property of the same value is punishable by a dishonorable discharge, total forfeitures, and *five* years confinement. Here the government charged the missing base billeting office funds as "military property" thus doubling the potential period of confinement. *See* MCM 1984, Part IV, paragraph 46(e)(1)(c) & (d). It would appear that a punishment that includes five years confinement could adequately satisfy the interests of justice. The gravamen of the offense was the embezzlement of money, not the theft of "military property."

Judge PRATT (concurring in the result):

I find myself in the somewhat unusual position of concurring just a little bit with everyone. My concurrence with the result reached by the majority is based solely upon my concurrence with the Chief Judge in his concurring opinion that money, as a class of property, regardless of its source, should not be afforded the special protective status (a doubling of the available maximum confinement) accorded to "military property" under Article 121, UCMJ.

In *United States v. Schelin*, 15 M.J. 218 (C.M.A.1983), the Court of Military Appeals noted that the 1969 Manual for Courts–Martial gave little guidance as to the meaning of "military property." As to the present issue, the same can still be said of the 1984 Manual for Courts–Martial. The nearest indication that money was intended to be included within the category of "military property" is reference to Article of War 94, at best a distant cousin of Article 108 and one which cannot reasonably claim strict applicability to today's Article 121.

Upon analysis, I am forced to conclude that there is simply no clear indication of present legislative intent on this issue. Until such an intent is manifested by legislative clarification, appellate courts must acknowledge they have left the realm of discerning and announcing what the law "is" and are proceeding into the realm of exercising discretion as to what the law "should be." For my part, as stated at the outset, I do not believe that money "should be" included in the definition of military property. My view, in other words, is that money can be used to purchase military property, but it cannot qualify as military property in and of itself. It is the property it purchases, not the money itself, which has the "uniquely military nature" or will be put to a "function" which merits its inclusion in the specially-protected category of "military property". *See Schelin, supra,* at 220.

As to the framework for determining whether a certain item (other than money) does or does not qualify as "military property", I favor the approach and the reasoning expressed by Senior Judge Blommers in his dissent. The majority's bright-line "appropriated versus nonappropriated" approach offers a tempting clarity and simplicity of application. Senior Judge Blommers' case-by-case approach, on the other hand, offers neither clarity nor simplicity. Nevertheless, I agree with Senior Judge Blommers that the majority's approach draws an overly simplistic distinction which is neither mandated by the Court of Military Appeals decision in *United States v. Simonds*, 20 M.J. 279 (C.M.A.1985), nor by logic. As noted in the majority opinion, the *Simonds* decision turned on the fact that the merchandise had been purchased with appropriated funds. Indeed, the accompanying language in *Simonds* strongly suggests that *all* property purchased with appropriated funds constitutes "military property". However, it stops short of saying that *only* property purchased with appropriated funds can constitute "military property." For the reasons so ably discussed by Senior Judge Blommers in his dissent, so will I.

Senior Judge BLOMMERS (dissenting):

I find no reason under the law to take as restrictive a view of the term "military property" as my brothers do in this case. I therefore dissent. In my judgment, the better approach would be to resolve a question as to the property's status, military or nonmilitary, on a case-by-case basis, rather than carve out an entire class of property and define it as "nonmilitary" just because such property does not derive its existence from "funds appropriated by Congress" and is being held by a Nonappropriated Fund Instrumentality (NAFI) for its exclusive use. That is precisely how I interpret the Court's holding in this case.

I concur with past holdings of this Court addressing the question, and do not believe my view of how this case should be resolved is in conflict with any holdings by the United States Court of Military Appeals. Clearly, property held for retail sale by the Army–Air Force Exchange Service (AAFES), no different than any other department or convenience store in this country, should not be considered military property. *United States v. Schelin*, 12 M.J. 575 (A.F.C.M.R.1981), *aff'd* 15 M.J. 218 (C.M.A.1983). Likewise, property being held for bingo prizes at an Officers' or Noncommissioned Officers' Club should not be so classified. *United States v. Geisler*, 37 C.M.R. 530 (A.B.R.1966). But to say that the same result should be reached as to all nonappropriated fund property being held for the exclusive use of a NAFI goes too far.

Nor do I believe that the Court of Military Appeals most recent decision address-

ing the issue of what can constitute military property, *United States v. Simonds*, 20 M.J. 279 (C.M.A.1985), can be interpreted as a basis for reaching that conclusion. *Simonds* dealt with a camera taken from a ship's store. Property in a ship's store is available for sale to sailors assigned to the ship, particularly while at sea. It is undoubtedly equivalent to a mini-base exchange. Its purpose is to enhance morale. The Court noted its earlier holding in *Schelin* that retail merchandise belonging to AAFES was not military property, but stated:

> The significant factual difference here is that the merchandise in the ship's store is purchased by an appropriated-fund activity.... We may presume that items purchased with funds appropriated by Congress to a military department fall within the definition of 'military property.'

20 M.J. at 280. I do not read the Court's holding as an endorsement of the opposite; that is, that all property belonging to a NAFI is therefore *not* military property. In fact, many types of property used exclusively by NAFIs are authorized to be purchased with appropriated funds. Does that mean that all property so purchased is, therefore, "military property?" *Simonds* might be read to support an affirmative answer to that question.

The Court of Military Appeals in *Simonds* quoted at some length, with approval, from matters submitted by Navy appellate government counsel. As pertaining to a relationship between property in the ship's store and performance of a military function, counsel argued:

> 'The purpose of a ship's store is to provide a convenient and reliable source where sailors, particularly while at sea, can obtain their ordinary needs at affordable prices. In fact, while at sea, the ship's store is the only source for such needs.... Consequently, a ship's store is factually distinguishable from a Post or Base Exchange, or even the Navy Exchange, which serves only as alternative sources for satisfying such needs ashore. In other words, the ashore service member may frequent a local exchange as well as countless civilian establishments, while the sailor at sea has no such choice.'

> 'Thus, a ship's store performs a morale and welfare function which is an integral part of the naval forces. Providing for the health, morale, and welfare of the crew is as much a military purpose as is providing weapons and ammunition. Indeed, the maintenance of health, morale, and welfare of the crew is essential to the successful completion of the command's mission. Since ship's store merchandise is intended and furnished for use by crew members, its wrongful disposition and sale has a direct adverse impact on the morale and welfare of the crew.'

20 M.J. at 280–281. If one accepts this rationale, then merchandise at a retail store at any of the numerous small United States land-based military installations and sites scattered throughout the world, located perhaps hundreds of miles from the nearest civilian community of any size, or on a remote mountain top, should be considered military property even if run by AAFES. This highlights the principle difficulty I have with the approach taken by the Air Force Court in this case. In my judgment, the focus of inquiry should be directed at the functional relationship between the property involved and military mission accomplishment, not what instrumentality within the Government has possession and control over it at the time an offense against that property is committed. Whether the source of the property was appropriated or nonappropriated funds is certainly a factor to be considered. The foundation for this analysis should be the definition of "military property" contained in the Manual for Courts–Martial as refined by the Court of Military Appeals.

As the majority opinion states, "military property" is defined in the Manual as "all property, real or personal, owned, held, or used by one of the armed forces of the United States." MCM, Part IV, paragraph 32 c(1). AAFES retail merchandise is specifically excluded therefrom. In *Schelin* the Court held:

In the absence of any Congressional guidance, it seems most likely to us that 'military property' was selected for special protection due to its role in the national defense. In other words, it is either the uniquely military nature of the property itself, *or the function to which it is put*, that determines whether it is 'military property'.... We do not suggest that it is only tanks, cannons, or bombers that merit the protection ... for many items of ordinary derivation are daily put to military use.

15 M.J. at 220 (emphasis added). In *Simonds*, the Court quoted this definition of military property from the *Schelin* case. 20 M.J. at 280.

Applying the Manual's definition of "military property" and the above set forth caselaw, I conclude that the billeting funds involved in the instant case were military property of the United States. Judge Leonard summarizes the uses to which these funds are put in the first portion of his opinion, *i.e.*, to help maintain and upgrade these quarters. The base billeting manager testified at trial that such funds could also be used to pay the salaries of NAF billeting staff members and cleaning personnel. Regarding who stays in these quarters, the following testimony was provided by the billeting manager:

ATC: ... Could you please tell us who stays at the billeting quarters?

WIT: Transients.

Q: And what does that entail?

A: It's either people that are TDY [temporary duty assignment] to the base who are here to help in some capacity; students who are here for training; or it could be military retired "Space A" [space available basis] people.

She stated that TDY personnel and students, who are there pursuant to military orders, take priority as to assignment of quarters. When people in these categories stay at such facilities they are entitled to reimbursement from appropriated funds for room fees paid to the NAFI.

It is common knowledge to any of us who have been in the military a number of years, that the vast majority of the rooms in Air Force temporary billeting facilities are occupied by servicemembers or civilian employees who are at an installation TDY—there to provide operational assistance or receive training. Most who stay at temporary lodging facilities are personnel newly assigned to the installation and their dependents, who reside there until their permanent quarters become available. Thus, those who reside in these facilities are there to learn or do a job in furtherance of mission performance at that installation. Having such facilities conveniently available on an installation, as opposed to relying on off base motels or hotels for this service, also assists mission accomplishment.

As a former trial judge who traveled a circuit comprised of more than 15 military bases spread throughout the Northeastern United States, I know how important comfortable quarters are while you are on the road. Good quarters are morale and welfare enhancers, much like ships' stores. *United States v. Simonds, supra.*

In sum, temporary billeting instrumentalities perform a *function* directly related to military mission accomplishment. I conclude, without hesitation, that their assets, supplies and facilities are "military property."

I make two other observations. I perceive an underlying concern on the part of a number of my brothers simply because theft of "military" property now permits increased punishment. MCM, Part IV, paragraph 46 e (1984). The drafters' Analysis should ameliorate any such concern. It provides:

*1986 Amendment:* The maximum punishments for larceny were revised as they relate to larceny of military property to make them consistent with the punishments under Article 108 and paragraph 32e, Part IV, MCM, 1984. Before this amendment, a person who stole military property faced less punishment than a person who willfully damaged, destroyed, or disposed of military property. The revised punishments are also consistent with 18 U.S.C. 641.

The majority opinion also points out that one reason for maintaining a restrictive view of what constitutes military property "is the fact that Article 108, UCMJ, criminalizes *negligent* conduct in dealing with such property...." (Emphasis added.) I first note that the damage, destruction, or loss of such property through neglect carries a considerably less maximum punishment than than the willful commission of that offense or, now, the theft of such property. *See* MCM, Part IV, paragraphs 32 e(2), 32 e(3), and 46 e(1)(a) and (c) (1984). Finally, offenses that criminalize negligent conduct are certainly not uncommon under military law. *See, e.g.*, MCM, Part IV, paragraphs 11 (missing movement), 16 c(3) (dereliction of duty), 20 c(2) (suffering a prisoner to escape through neglect), 23 c(3) (endangering safety of a command, unit, place, ship, or military property), 27 c(1) (failing to secure public property taken from the enemy), 34 (hazarding of vessel), 44 c(2) (involuntary manslaughter), 80 (firearm, discharging through negligence), and 85 (negligent homicide).

I would affirm the findings of guilty as returned by the trial court and the sentence as approved by the convening authority.

Judge SPILLMAN concurs in the dissent.