# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Senior Airman BRITTNEY L. HALL
## United States Air Force

## ACM 38241

## ____ M.J. ____

## 11 April 2014

Sentence adjudged 16 October 2012 by GCM convened at Minot Air Force Base, North Dakota.  Military Judge:  Michael A. Lewis (sitting alone).

Approved Sentence:  Dishonorable discharge, confinement for 30 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

Appellate Counsel for the Appellant:  Major Matthew T. King.

Appellate Counsel for the United States:  Major Jason S. Osborne and Gerald R. Bruce, Esquire.

Before

ORR, MARKSTEINER, and WIEDIE
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final publication.

MARKSTEINER, Senior Judge, delivered the opinion of the Court, in which ORR, Senior Judge[1], joined.  WIEDIE, Judge, filed a dissenting opinion.

A general court-martial composed of a military judge sitting alone convicted the appellant, consistent with her pleas, of violating a lawful order on divers occasions; larceny of military property of a value of over $500; assault with a loaded firearm;  and obstructing justice, in violation of Articles 92, 121, 128, and 134, UCMJ,

---

[1] Senior Judge Orr participated in this decision prior to his retirement.

10 U.S.C. §§ 892, 921, 928, and 934. The adjudged sentence consisted of a dishonorable discharge, confinement for 42 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Pursuant to a pretrial agreement, the convening authority approved only 30 months of confinement and the remainder of the sentence as adjudged.

The appellant did not raise any issues on appeal; however, this Court specified the following issue: Whether the appellant's plea of guilty to larceny was rendered improvident by the appellant's providency inquiry statements that, "a few days . . . , a week, a week and a half" after the marriage ceremony the appellant and her purported husband "decided to give [the marriage] a try."

In addition to the specified issue, we also examine the providence of the appellant's plea to the larceny charge with respect to whether BAH is "military property." We hold that the appellant's plea to larceny is provident with the exception of the words "military property."

*Background*

The appellant was an airman first class assigned to her first duty station at Minot Air Force Base (AFB), North Dakota. Unmarried, enlisted military members assigned to Minot AFB were required to live in the on-base dormitories until they reached the rank of senior airman and had over three years of service. As of September 2010, the appellant was unmarried, had not attained the rank of senior airman, and had less than three years of service, and thus was required to live in the dormitories and was not entitled to BAH.

Desiring to live off base, the appellant engaged in a practice known as "ghosting." Ghosting is a term used to describe an Airman who maintains a dormitory room on base, but actually lives off base. Airmen who ghost pay for their off-base residences out of pocket. While ghosting, the appellant actually lived in a two bedroom apartment in the city of Minot. She shared the apartment with a male, Airman First Class (A1C) JTY, whom she had previously dated, and a female, Senior Airman (SrA) NMK, with whom she had, at the time, a romantic relationship. Like the appellant, A1C JTY and SrA NMK were also ghosting.

In September 2010, the three engaged in a conversation with SrA CHB who also lived in their apartment complex. The appellant and her roommates discussed the financial hardships they were enduring because they were paying for the apartment out of their own pockets. SrA CHB suggested that if the appellant and A1C JTY got married, they could both receive BAH and be better able to afford living off base.

Over the next week or so, the appellant and A1C JTY discussed the idea of getting married in order to receive BAH. They decided to do so and on 28 September 2010, were married in a civil ceremony. On the day of the marriage, the appellant provided a

copy of the marriage certificate to the Minot AFB finance office and began receiving BAH with an effective date of 28 September 2010. Both the appellant and A1C JTY continued to receive BAH until A1C JTY separated from active duty on 14 May 2011. On 5 December 2011, the appellant returned to the finance office to update her status to reflect that her husband had separated from active duty. She then started to receive BAH at the increased "with dependent" rate. Additionally, she received back-dated "with dependent" rate BAH retroactively starting on the date A1C JTY left active duty.

It is undisputed that on 28 September 2010, when the appellant and A1C JTY were married, they had no intention of establishing a life as husband and wife. However, during the *Care* inquiry[2], the appellant made various statements indicating that at some point they did attempt to live as husband and wife.

The military judge noted that she appeared to be qualifying her answers to his questions about the marriage, and he inquired further about it. The appellant reaffirmed that at the time of the marriage ceremony she did not intend to live as husband and wife with A1C JTY. She said, however, that they "actually decided to give it a try . . . a few days . . . , a week, a week and a half" after they were married because they had been living together and they "felt like [they] could make it work." In response to a question from the military judge, the appellant stated that she thought she was really married and that she and A1C JTY acted like a married couple by doing the things married couples do. She said she and A1C JTY would go out, share money, spend time together, and be intimate, "the things that anybody in a . . . committed relationship would do except for the fact that we were legally married."

The court-martial recessed overnight. The next day, the military judge asked the appellant if she thought the marriage was a sham marriage. The appellant agreed it was a sham marriage. The military judge concluded the marriage was a sham, articulated his basis for doing so, and found the plea to larceny to be provident. He then entered findings of guilty in accordance with the appellant's pleas.

Despite the appellant's vacillation during the *Care* inquiry, we find nothing in the record before us, considered in its entirety, presenting a substantial basis in law or fact causing us to question the providence of the appellant's guilty plea. Notwithstanding our dissenting colleague's argument to the contrary, we find it impossible to decide this case without addressing the nature of the appellant's marriage. We hold that a marriage that is a sham at its inception remains a sham for purposes of acquiring housing allowances to which one or both parties to that sham marriage would not otherwise be entitled.

---

[2] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

*Providency of Plea to Larceny of Military Property*

We review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea de novo. *See United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008); *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996) (citation omitted). "In doing so, we apply the substantial basis test, looking at whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *Inabinette*, 66 M.J. at 322; *see also United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991) (A plea of guilty should not be overturned as improvident unless the record reveals a substantial basis in law or fact to question the plea.). "In reviewing the providence of Appellant's guilty pleas, we consider his colloquy with the military judge, as well any inferences that may reasonably be drawn from it." *United States v. Carr*, 65 M.J. 39, 41 (C.A.A.F. 2007) (citing *United States v. Hardeman*, 59 M.J. 389, 391 (C.A.A.F. 2004)). A military judge abuses this discretion when accepting a plea if he does not ensure the accused provides an adequate factual basis to support the plea during the providency inquiry. *See Care*, 40 C.M.R. at 253. This is an area for which the military judge is entitled to much deference. *See Inabinette*, 66 M.J. at 322.

Our reviewing standard for determining if a guilty plea is provident is whether the record presents a substantial basis in law or fact for questioning it. *See id.*; *Prater*, 32 M.J. at 436. At trial, the military judge must have ensured the appellant understood the facts that support her guilty plea (what she did), and the military judge must be satisfied the appellant understood the law applicable to her acts (why she is guilty), and that she is actually guilty. *See United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) (citing *Care,* 40 C.M.R. at 250-51); *United States v. Jordan*, 57 M.J. 236, 238 (C.A.A.F. 2002).

*BAH as "Military Property"*

The appellant was charged with stealing military property in the form of BAH. As a preliminary issue, we must determine whether BAH constitutes military property.

Our superior court has not directly addressed the issue of whether housing entitlements are "military property" although it has implicitly approved this conclusion. *See United States v. Helms*, 47 M.J. 1 (C.A.A.F. 1997) (upholding a conviction for larceny of military property for the theft of Basic Allowance for Quarters (BAQ) and Overseas Housing Allowance (OHA) without specifically addressing the issue of housing allowances as military property).

This Court, however, has directly addressed this question. In *United States v. Thomas*, 31 M.J. 794, 797 (A.F.C.M.R. 1990), we held that Variable Housing Allowance (VHA) was not "military property of the United States." We subsequently extended the

*Thomas* holding to cover BAQ. *See United States v. Ryan*, ACM 28906 (A.F.C.M.R. 19 June 1992) (unpub. op.). Although the name has changed, for purposes of determining whether they constitute "military property," BAH and BAQ are indistinguishable. Housing allowances are not unique to the military. They are not put to any military function that entitles them to the enhanced maximum punishment authorized for "military property" under Article 121, UCMJ, 10 U.S.C. § 921. As this Court noted in *Thomas*, "[o]rdinarily, it is the property it purchases, not the money itself, which has the 'uniquely military nature' or will be put to a 'function' which merits its inclusion in the specially-protected category of 'military property.'" *Thomas*, 31 M.J. at 797 (citing *United States v. Ford*, 30 M.J. 871, 876 (A.F.C.M.R. 1990) (Pratt, J. concurring opinion)); *see also United States v. Schelin*, 15 M.J. 218, 220 (C.M.A. 1983). Absent direct guidance from our superior court we see no reason to deviate from our previous decisions on this issue, and therefore find that the property alleged to have been stolen in this case was not military property. We therefore affirm a finding of guilty to the lesser included offense of larceny of property other than military property.

*Nature and Legal Status of Appellant's Marriage*

Contrary to our dissenting colleague's argument, we find it impossible to address the issue before us without addressing what appears to be an issue of first impression for this Court: Whether a marriage that, when entered into, was a sham, always remains a sham, or whether such a marriage is essentially capable of being later ratified by a change in the subjective intent of the parties to the marriage? Restated, is such a marriage void, or voidable?

The substance of our colleague's conclusion that the appellant was in a "legally valid marriage" is as follows: Because she possessed a *facially* valid marriage license and had participated in a marriage ceremony (albeit with an admittedly fraudulent purpose, and during which she and A1C JTY lied to the solemnizing official), several days later when the appellant and A1C JTY decided to give the marriage a try, the confluence of those facts rendered the marriage valid – or lawful – for any and all purposes. At the very least, he concludes, that the appellant *believed as much*.

We reject the proposition that the appellant was in a valid marriage. The validity of a marriage is ordinarily a question of fact to be decided in accordance with state law. *See United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000); *United States v. Allen*, 27 M.J. 234, 239 (C.M.A. 1988). State law is not determinative if a service member enters into a sham marriage to fraudulently obtain government benefits or to commit immigration fraud. *See Lutwak v. United States*, 344 U.S. 604, 611 (1953); *United States v. Bolden*, 28 M.J. 127, 130 (C.M.A. 1989). As noted in *Bolden*,

> Perhaps under that law – which, according to accepted principles of conflict of laws, would govern the validity of the marriage – participation in a

marriage ceremony is insufficient to create a valid marriage, if the parties never intended to live together as husband and wife. In that event, completion of the marriage ceremony clearly would not shield [the appellant] from conviction of larceny.

28 M.J. at 129.

In this case, however, the record does not contain sufficient information to ascertain whether the appellant's marriage was in fact ever "valid" in North Dakota. The appellant and A1C JTY lied to the civil judge who presided over their ceremony in order to acquire state-conferred status as a married couple under North Dakota law. According to the appellant's testimony, the judge who solemnized the marriage[3] did so only after the couple engaged in the promises or vows commonly attested to during marriage ceremonies. When asked by the military judge if the civil judge who conducted the marriage ceremony had them make any promises or representations regarding their intent, the appellant recalled, "I can't remember the exact words that he had us repeat, but it was along the lines of promising to love us [sic] other through sickness and health, richer and poorer, things of that nature." Only after the appellant and A1C JTY repeated these statements did the civil judge pronounce them married.

To say this was a "valid marriage" is to assume the civil law judge would have pronounced them married even if they refused to repeat those promises as he instructed. Indeed, by our colleague's estimation, the appellant and A1C JTY would have been every bit as validly married if they would have told the civil law judge "we're not going to say any of that stuff. The only reason we're doing this is to get money from the Air Force to which we would otherwise not be entitled. Now get on with it." Fraudulently misleading a state official into conferring a state-regulated status upon them may have placed the appellant and A1C JTY in possession of a piece of paper saying they were married, but that is not the same as concluding, judicially, that they were validly – lawfully – married.

We also reject the appellant's argument that her case stands in "stark contrast to the fake marriage condemned by the CMA in *Bolden*." In *Bolden*, our superior court upheld the appellant's conviction of conspiring to defraud the government out of housing allowance money by orchestrating a sham marriage between the appellant's friend, Bahre, and his girlfriend, Willoughby. *See Bolden*, 28 M.J. at 131. Although the history and living arrangements between Bahre and Willoughby differed from the appellant's and A1C JTY's, the Court's overarching rationale for upholding Bolden's conviction is every bit as applicable to the case now before us. In both cases the parties to the sham marriages undertook courses of conduct specifically intending – with singular focus – to gain access to government funded payment streams to which they would not otherwise be lawfully entitled.

---

[3] *See* North Dakota Century Code § 14-03-09.

"Even if the marriage was valid under [state] law," our task would be to "inquire whether Congress intended for a servicemember to receive a quarters allowance as a married person if the marriage was a sham." *Bolden*, 28 M.J. at 129-30, citing *Lutwak*, 344 U.S. 604 (validity of marriage not determinative in case of servicemen convicted of engaging in sham marriages with non-citizens where purpose of marriages was to circumvent immigration laws). In *Bolden*, our superior court noted it was "convinced that when Congress authorized a basic allowance for quarters for a servicemember with 'dependents,' . . . Congress did not intend that the term include a person who was linked to a servicemember by only a sham marriage." *Id*. at 130. Congress "also never intended to encourage or subsidize the sort of arrangement into which [the appellant's friend and girlfriend] entered . . . there is nothing unfair in imposing criminal liability on a servicemember who seeks to obtain allowances from the Government by entering into a fake marriage; and, in light of *Lutwak*, we are convinced that Congress meant to impose such liability." *Id*. 130-131.

"The crucial issue in determining the legitimacy of a marriage is not the couple's way of life within the marriage but the spouses' intent at the time the marriage was contracted." Note, "*The Constitutionality of the INS Sham Marriage Investigation Policy*, 99 Harv. L. Rev. 1238, 1249 (1986). Under U.S. immigration law, a sham marriage is void from the start for purposes of securing residency status. In the *Matter of Awwal*, the U.S. immigration service held that even in a case where the U.S. citizen stepparent of an alien stepson had demonstrated "active parental interest," the child enjoyed no advantageous immigration status customarily available to stepchildren because the father's original marriage to the boy's mother was a sham. *Matter of Awwal*, 19 I&N Dec. 617, 619-21 (BIA 1988). "A sham marriage is invalid from its inception." *Id*. at 621.

Military law follows suit. In *Bolden*, the trial judge instructed the members:

[A] sham marriage *is void under the law of this country as against public policy* and such a marriage can have no validity. Mutual consent is necessary to every contract and no matter what forms or ceremonies the parties go through indicating the contrary, they do not contract if they do not in fact assent. Marriage is no exception to this rule. If the spouses agree to a marriage only for the sake of representing it as such to the outside world, they have never really agreed to be married at all. They must assent to enter into the relation as it is ordinarily understood and it is not ordinarily understood as merely a pretense or a cover to deceive others.

*United States v. Bolden*, 23 M.J. 852, 854 (A.F.C.M.R. 1987) (emphasis added).

Affirming our holding in *Bolden*, our superior court, not mincing words, held "the Government's evidence was legally sufficient to sustain the findings of guilty and the

instructions adequately informed the court members of the applicable legal principles." *Bolden*, 28 M.J. at 131. Accordingly, a sham marriage is void, not voidable.

In order to clarify this issue prospectively, we now follow *Bolden* and hold a marriage that is a sham at its inception remains a sham for purposes of acquiring housing allowances to which one or both parties to that sham marriage would not otherwise be entitled. We therefore find all BAH monies the appellant received, excluding those to which she would have been eligible to receive as a single person after achieving requisite rank and or longevity, to have been obtained by false pretenses.

Philosophically, one might present this hypothetical as a challenge to our holding regarding the void nature of a sham marriage for purposes of gaining entitlement to military benefits: "Assume Couple #1 marry on 1 January with the intent to spend a life together, submit the required paperwork to the finance office, and begin receiving housing benefits that same day. Assume further that the next day they realize they cannot stand each other, and one of them moves out. They spend the next twenty years collecting increased housing allowance lawfully payable only to married service members. Assume Couple #2 also marries on 1 January, only this second couple took part in a sham marriage for the sole purpose of getting a housing allowance to which they would not otherwise lawfully be entitled. Unlike the first couple, Couple #2 realize on day two that they were meant for each other and spend the next twenty years devoted to one another in a way most people would describe as an ideal marriage. If they collect the same increased housing allowance, they have committed a crime and Couple #1 has not. How are we to reconcile that outcome?"

Our answer to such a rhetorical challenge is that Couple #2 should not have engaged in the sham marriage in the first place. Regretting having committed a crime, or having difficulty in undoing it, does not mean the crime never took place. Our jurisprudence recognizes this reality as axiomatic in cases of larceny, where the person wrongfully in possession of another's property commits that offense the moment he forms an intent to permanently deprive the rightful owner of its possession. It does not matter if he harbors that intent for only a second, or if he returns the property, or later pays the owner five times its worth. The same principle holds true in the case of desertion. Once the required *mens rea* and bad act intersect, subsequent attendant factors may be appropriate for consideration in extenuation and mitigation, but the crime itself cannot be un-committed.[4]

Others skeptical of the position we take today may posit that people can get married for all sorts of reasons. For example, some marry to gain approval of a family

---

[4] Though not specifically stated, our dissenting colleague's position appears to be that not only are sham marriages essentially ratifiable, but that such ratification is a one-way street, in that once the appellant and A1C JTY decided to "give it a try," they become lawfully entitled to BAH unless they later divorce or have the marriage annulled, irrespective of how long that effort to "give it a try" lasts.

member, or to share in raising an unplanned child. Who is to say what is a 'sham' or an 'invalid' reason for marriage? To that proposition, we note that the answers to questions like those, while intellectually appetizing, are beyond the scope of this decision. What we hold today is simply this: It is not the absence of a perfect or ideal "love, honor, and cherish" motivation of the parties that renders the consequences flowing from the appellant's actions in the case before us criminal; rather, it is the affirmative presence of a singularly focused illicit one – an intent to fraudulently acquire a government payment stream – that does so.

We also reject the appellant's asserted belief that within "a few days . . . , a week, a week and a half" the appellant thought she was legally married, that they acted like husband and wife, and she believed she was married and conducted herself as though she was married. Though the appellant attempted to recast her actions in as favorable a light as possible during the *Care* inquiry by initially equivocating on various points, the military judge pressed where he needed to, and in so doing established the following facts, which we find sufficient to leave her guilty plea undisturbed.

Prior to the sham marriage, the appellant lived with SrA NMK, who was her then current girlfriend, and with A1C JTY, whom she had previously dated. The appellant spent some nights in A1C JTY's room and other nights in SrA NMK's room. There is no indication the marriage in any way altered the sleeping arrangements or relationships among the roommates. Quite the contrary, by early February 2011, A1C JTY had moved out and the appellant and SrA NMK moved into a rented house together, along with another roommate. Notably, also in February 2011, the appellant threatened SrA NMK with a loaded gun because of concerns that SrA NMK had cheated on her. On these facts, we disagree with our colleague's conclusion that the appellant believed she and A1C JTY "lived together as husband and wife."

As to sharing money, the appellant offered no specifics except that after A1C JTY moved out, "[w]hen he would call and tell me he needed money, I would give it to him." When asked why she provided money to A1C JTY when he would call and ask for it, she explained that she gave him money "[b]ecause he needed it, and I've always been there for him to help him out, whatever he needed." When the judge pinned her down and asked her to specify whether she was required to support him because they were married or for some other reason, she answered, "Well, I was required to provide him support, *but it was because he – me and him are really, really close, sir.*" Nothing about her statement suggests her inclination to "help out" A1C JTY financially was in any way related to their sham marriage, or that she was lawfully responsible for A1C JTY because he was her spouse.

On the contrary, we find it at least as plausible – indeed more probable – to infer from her statements that the appellant and A1C JTY were friends who agreed to fake a marriage to make some extra cash, and she simply honored that agreement when, from

time to time, he asked her to do so. The appellant's self-described practice of helping out A1C JTY lacks the sort of specificity we might have found supportive of our dissenting colleague's position. For example, she did not say she and A1C JTY shared bills, split grocery or other living expenses, paid taxes as a married couple, or in any way meaningfully managed their finances as married couples customarily do. Rather, she offered nothing beyond broad generalities constituting little more than what appears to be an effort to minimize her misconduct in the eyes of others present in the courtroom.[5]

Considering the entire record before us, including this appellant's demonstrated propensity to attempt to shape the evidence as favorably as possible to her advantage,[6] and in light of the discretion accorded to a military judge when evaluating the providence of an accused's guilty plea, we find nothing in the appellant's meandering, off again-on again statements during the *Care* inquiry to reveal a substantial basis in law or fact sufficient to cause us to question the plea. *See Inabinette*, 66 M.J. at 322. Rather, those statements reflect the reality Judge Cox observed in *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996) (citing *United States v. Penister*, 25 M.J. 148, 153 (C.M.A. 1987)):

> Often an accused is reluctant to admit to a particular aspect of an offense. However, that should not vitiate his guilty plea if he recognizes that the evidence against him will prove the point, and he admits his guilt to the offense. We should not overlook human nature as we go about the business of justice. One aspect of human beings is that we rationalize our behavior and, although sometimes the rationalization is "inconsistent with the plea," more often than not it is an effort by the accused to justify his misbehavior. A good trial judge can usually sort out the guilty plea and determine if an accused is so pleading because he has committed the offense charged.

In the case before us, we believe the trial judge effectively sorted out the appellant's narrative and appropriately accepted her guilty plea. Accordingly, as to the Specification of Charge IV, we find the military judge did not abuse his discretion by accepting the appellant's plea of guilt, and we affirm the finding, excepting the words "military property."

*Sentence Reassessment*

Having found error regarding the theft of BAH as constituting military property, we must consider whether we can reassess the sentence or whether we must return the

---

[5] Our dissenting colleague mistakes our description of the appellant's statements in this regard as "reluctance to admit guilt." We instead consider such statements to constitute the appellant's efforts to downplay the wrongfulness of her conduct without directly challenging its criminality.

[6] The appellant was also convicted of wrongfully endeavoring to influence SrA NMK's testimony as a witness during the Appellant's Article 32, UCMJ, investigation by, *inter alia*, providing SrA NMK with a handwritten list of things she should tell the investigation officer regarding the nature of their relationship and when it started.

case for a rehearing on sentence. To validly reassess a sentence to purge the effect of error, we must be able to (1) Discern the extent of the error's effect on the sentence; and (2) Conclude with confidence that, absent the error, the panel would have imposed a sentence of at least a certain magnitude. *See United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (citing *United States v. Hawes*, 51 M.J. 258, 260 (C.A.A.F. 1999); *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002); *United States v. Taylor*, 51 M.J. 390, 391 (C.A.A.F. 1999)). We must also determine that the sentence we propose to affirm is "appropriate," as required by Article 66(c), UCMJ, 10 U.S.C. § 866(c). "In short, a reassessed sentence must be purged of prejudicial error and also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

This Court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has often held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.A.A.F. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15-16.

We recognize that, in this case, our action reduces the maximum permissible sentence the appellant faced from 23 years confinement to 13 years and 6 months confinement, while all other aspects of the maximum punishment remain the same. Nonetheless, our review of the record reveals that the assault with a loaded firearm charge was the primary focus of the trial, and the other charges were essentially viewed as collateral matters. The victim of this crime was a fellow military member and a former romantic interest of the appellant. The appellant put a loaded firearm to her head repeatedly and asked her why she should allow her to live.

We are convinced beyond a reasonable doubt that had the military judge accepted a plea to the lesser included offense of larceny of non-military property, rather than the greater offense of larceny of military property, he would have adjudged a sentence of at least a dishonorable discharge, confinement for 30 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Therefore, we reassess the sentence to the sentence that was approved: a dishonorable discharge, confinement for 30 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Furthermore, we find the sentence, as reassessed, to be appropriate. *See United States v. Peoples*, 29 M.J. 426, 427-28 (C.M.A. 1990).

*Conclusion*

The approved findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.

Judge Wiedie, concurring in part and dissenting in part.

I agree with the majority's conclusion that, based on the previous holdings of this Court, BAH is not "military property." As such, I concur with their holding with respect to modifying the findings to strike the "military property" language from the larceny specification. I dissent, however, from their conclusion that the appellant providently pled to larceny of BAH for a period covering the entire charged timeframe.[7]

I respectfully believe the majority fails to distinguish the difference between whether the appellant was in a legally valid marriage versus whether she providently pled to larceny of property of a value over $500. The issue this Court must address is whether "there is something in the record of trial, with regard to the factual basis or the law that would raise a substantial question regarding the appellant's guilty plea." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). To be guilty of larceny, one's obtaining of property must be accomplished by false pretenses with a criminal state of mind.

Without a doubt, when the appellant took her marriage certificate to the finance office on the day of her marriage, she had a criminal state of mind. At that time, the reason for her marriage was to live off base and receive BAH. However, the appellant stated in her *Care* inquiry that within "a few days . . . , a week, a week and a half" she and A1C JTY decided to try to make the marriage work. The appellant said she thought she was legally married and they acted like husband and wife. Although they subsequently gave up their attempt at making the marriage work, they did, according to the appellant's statements to the military judge, live as husband and wife soon after the marriage ceremony.

If the appellant had a valid marriage license, believed she was married, and conducted herself as though she was married, there is a substantial question whether her criminal state of mind continued past the first three to ten days of the marriage. The

---

[7] For the reasons articulated hereinafter, I would affirm a finding of guilty to larceny, but would except the words "of a value over $500" and substitute therefore the words "of some value."

BAH monies received from the time of her marriage until she and A1C JTY attempted to make a go of the marriage were certainly obtained with a criminal state of mind. It cannot be said, however, that any BAH monies received after they decided to live as husband and wife were obtained by false pretenses with a criminal state of mind, at least based on the comments of the appellant in her *Care* inquiry. *See United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969). Her plea was provident to larceny of some amount of money, but the information elicited from her during the providency inquiry failed to establish the amount obtained was greater than $500.

Implicit in this conclusion is a determination that BAH is a severable payment as opposed to a single payment stream. I believe the larceny of BAH over a period of time is not a single larceny. I reach this conclusion because while BAH will be paid each month after the entitlement is established unless the payee takes some affirmative action to inform the finance office they are no longer eligible, eligibility is determined on a day to day basis. If an individual becomes entitled to BAH on the 15th day of a month with 30 days, she would not be paid BAH for the entire month. Rather, her entitlement would be determined based upon the percentage of the month she was entitled to BAH. Conversely, if a person somehow became ineligible for BAH on the 15th day of a month with 30 days, she would still be entitled to a prorated BAH covering 15 days.

Here, I believe the appellant was not entitled to BAH during the time period she acknowledges that her marriage was a sham because she was not otherwise eligible to live off base and receive BAH and she had, at that time, the requisite criminal state of mind. However, her statements in the *Care* inquiry raise a substantial basis in fact and law to question the providency of her plea covering the time period when she claims she believed she was actually legally married and acted in accordance with that belief. If she was in a valid marriage, she would have been entitled to BAH. Aside from conclusory statements from the appellant, the record fails to reasonably establish that she did not believe her marriage, once she and A1C JTY treated it as a real marriage, would have entitled her to BAH. As such, the record fails to disclose evidence that she had a criminal state of mind in accepting such entitlements.

The issue at hand is clearly distinguishable from the Navy-Marine Corps Court of Criminal Appeals (NMCCA) decision in *United States v. Lepresti*, 52 M.J. 644 (N.M.C.C.A. 1999) and the Army Court of Criminal Appeals (ACCA) decision in *United States v. Hines*, ARMY 20120024 (A.C.C.A. 24 May 2013) (unpub. op.), *rev'd*, 73 M.J. 119 (C.A.A.F. 2014). In *Lepresti*, the NMCCA adopted a three-part test to determine whether the theft occurring over multiple months amounted to a single theft. *See Lepresti*, 52 M.J. at 653. The ACCA rejected the NMCCA's approach and found that theft of BAH over multiple months consisted of a separate larceny each month. *See Hines*, unpub. op. at 2, *rev'd*, 73 M.J. 119 (C.A.A.F. 2014). In both *Lepresti* and *Hines,* there was no issue concerning whether the appellant's criminal intent continued throughout the charged timeframe. Rather, the issue faced by both courts was whether

the amounts of money improperly received could be aggregated for purposes of finding that a theft was in the amount of a value over $500, thereby increasing the potential punishment. *Id.*; *Lepresti*, 52 M.J. at 653. The holdings in these cases are inapplicable to the present case because the appellant's *Care* inquiry responses raised substantial questions whether her criminal intent existed throughout the charged timeframe.

I disagree with the majority's characterization of the appellant's *Care* inquiry statements as a mere reluctance to admit her guilt. To the contrary, the record shows she wanted to plead guilty, likely to preserve the pretrial agreement she had entered into with the Government, but her statements to the military judge failed to establish her guilt as charged. I find it peculiar that the majority assumes she was vacillating on the larceny charge, yet she did not do so on the much more serious charge of assault with a loaded firearm. Viewing the *Care* inquiry as a whole, the statements of the appellant appear to be a straightforward recounting of her actions and subjective beliefs during the course of the marriage. The *Care* inquiry is replete with examples indicating the appellant's belief she was involved in a legally valid marriage, at least after the time she and A1C JTY tried to make a go of the marriage.

In the initial portion of the *Care* inquiry, there were at least six occasions when the appellant used qualifying language in answering questions about her intent for the marriage. Each of these responses clearly expressed an initial intent to enter into a sham marriage, but also raised the question of how long such an intent continued. The military judge noted the qualifying language and asked her about it. The appellant reaffirmed her intent at the time of the marriage ceremony did not involve an intent to live as husband and wife. She said, however, they "actually decided to give it a try" because they had been living together and they "felt like [they] could make it work." The military judge questioned when they decided to try to make the marriage work, and the appellant responded "a few days . . . , a week, a week and a half" after they were married. Although the suggestion to try to make the marriage work originated with A1C JTY, the appellant said she was willing to try because they had dated before, and she was willing to try to establish a life together with him. In response to the military judge's questions, the appellant stated she thought she was really married, and they acted like a married couple by doing the things married couples do. She said she and A1C JTY would go out, share money, spend time together and be intimate, "the things that anybody in a . . . committed relationship would do except for the fact that we were legally married."

After the military judge questioned whether the marriage was a sham based on the appellant's answers, the appellant conferred with her counsel and attempted to alleviate the military judge's concerns. Her answers, however, did nothing to shed more light on the issue. Rather, she explained that she thought she was guilty of the offense because she and A1C JTY eventually gave up trying to make the marriage work and separated. A1C JTY moved to Texas, but they had not, as of the court-martial, taken steps to get an

annulment or divorce although they had discussed it. Furthermore, even after A1C JTY returned to Texas, the appellant would send him money when he needed it.

The appellant never successfully articulated why she was guilty of the larceny offense with respect to the time period after she attempted to make the marriage work. Each time she was asked why she was guilty of this offense, she provided an answer that failed to express a legal and factual basis for her guilt. In the end, her plea was accepted based on her conclusory statement that she was guilty of the offense. Our system mandates rejection of a guilty plea if an accused "sets up matter inconsistent with the plea." Article 45(a), UCMJ, 10 U.S.C. § 845(a). Our practice differs from other federal courts that permit an accused to plead guilty even though he personally professes innocence by making an *Alford* plea. *See North Carolina v. Alford*, 400 U.S. 25 (1970). In this case, the appellant did not provide an adequate factual and legal basis for why she was guilty. Her statements during the providency inquiry were patently inconsistent with a criminal intent.

The majority concludes the marriage was not valid at its inception and never became valid. Unlike the majority, I see no need to answer this question because it is immaterial to the issue at hand. The validity of the marriage does not control whether the appellant had the criminal state of mind necessary to be guilty of larceny. If an individual is "married" by a person who, unbeknownst to him, has no authority to perform a marriage ceremony, would that person be guilty of the BAH larceny for receiving with dependent rate based on that marriage? No. They might be required to pay the money back, but they cannot be said to be guilty of larceny of the money because they did not have the necessary criminal state of mind.

The appellant's situation is somewhat similar. The question is not whether the marriage in question is legally valid. The question is whether the appellant thought the marriage was valid and legally entitled her to BAH. While she was clearly guilty of larceny of BAH for the time period when she was in the marriage for the sole purpose of receiving BAH, the same cannot be said for the time period when she thought she was in a legally valid marriage and was attempting to make that marriage work. It simply does not matter whether she was legally married or not; she thought she was legally married and, at least on the record before us, it cannot be said that she had the requisite criminal state of mind during the vast majority of the charged timeframe.

The majority's statement that "we now . . . hold a marriage that is a sham at its inception remains a sham for purposes of acquiring housing allowances to which one or both parties to that sham marriage would not otherwise be entitled" is overly broad because it fails to adequately address the intent necessary to commit a larceny. The majority opinion glosses over this issue stating "[o]ur jurisprudence recognizes . . .[a] person wrongfully in possession of another's property commits that offense the moment he forms an intent to permanently deprive the rightful owner of its possession . . . [i]t

does not matter if he harbors that intent for only a second, or if he returns the property, or later pays the owner five times its worth."

If this case involved a single payment, I would not disagree with the majority's statement of the law. However, this case does not involve a single payment. While the appellant's change of heart and decision to attempt to make her marriage work does not erase the criminal intent she had when she initially began to improperly receive BAH, it does call into question the providency of her plea for the subsequent time period.

Contrary to the majority's assertion, this case is distinguishable from *Bolden*, 28 M.J. 127 (C.M.A. 1989), in several aspects. In *Bolden*, there was no indication that the "married" couple ever intended to live as husband and wife. *See generally*, *id*. Thus, there was never any question whether the criminal state of mind continued for the entire time they received BAH. *Id*. Additionally, the appellant in *Bolden* was not a party to the marriage; he simply arranged the marriage for a fraudulent purpose. *Id*. As a charged coconspirator, Bolden aided and abetted one of the parties to the marriage in receiving allowances to which he was not entitled. *Id*. The crime was completed once there was an agreement to commit an offense and an overt act in furtherance of that crime (in that case, the marriage).

I am troubled by the majority's reliance on what was not in the record to uphold the guilty plea as opposed to relying on what is in the record. The questions the majority indicates were left unanswered are just that, unanswered. This Court should not fill in the blanks of a *Care* inquiry in an attempt to uphold the providency of a plea that is not supported by that appellant's statements. Contrary to the majority's assertion, it is not my characterization that the appellant and A1C JTY "lived together as husband and wife." Rather, that is what the appellant said during her *Care* inquiry.

This Court may rely on reasonable inferences to uphold the providency of a plea, but we should not engage in wild speculation to do so. In addressing the appellant's statement that she and A1C JTY shared money, the majority seems distressed by the fact the appellant did not provide her bank statements to support this claim. However, the uncontradicted statement of the appellant was that they did share money, as a husband and wife would do.[8] I refuse, unlike the majority, to rely on what was not in the *Care* inquiry. Rather, I would rely on what is in the *Care* inquiry to determine whether there is a legal and factual basis supporting an appellant's plea. I am unfamiliar with any case

---

[8] I would also note that the majority suggests the appellant did not feel an obligation to financially support A1C JTY because he was her husband. ("Nothing about her statement suggests her inclination to 'help out' A1C JTY financially was in any way related to their sham marriage, or that she was lawfully responsible for A1C JTY because he was her spouse.") I agree that appellant stated she gave him money "[b]ecause he needed it, and I've always been there for him to help him out, whatever he needed" but am baffled by the majority's willingness to ignore her statement that "I was required to provide him support." The appellant's primary reason for providing the money is not the issue. She recognized, at least based on her statements in the *Care* inquiry, that she had a legal obligation to provide support to A1C JTY because she was receiving BAH at the with dependent rate.

where this Court upheld the providency of a plea based on what was not in the record, and I refuse to do so in this case.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

ACM 38241